An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1068

NORTH CAROLINA COURT OF APPEALS

Filed: 18 February 2014

IN THE MATTER OF:

L.T.

Wake County
No. 12 JT 62

Appeal by respondent-mother from order entered 24 June 2013 by Judge Monica M. Bousman in Wake County District Court. Heard in the Court of Appeals 27 January 2014.

> *Roger A. Askew for petitioner-appellee Wake County Human Services.*

> *Pamela Newell for guardian ad litem.*

> *Levine & Stewart, by James E. Tanner III, for respondent-appellant mother.*

BRYANT, Judge.

Respondent-mother appeals from an order terminating her parental rights to her minor child Louis.[1] Because petitioner's

---

[1] Louis is a pseudonym used to protect the identity of the juvenile pursuant to N.C.R. App. P. 3.1(b).

evidence and the district court's findings of fact are sufficient to establish grounds for termination based on neglect under N.C. Gen. Stat. § 7B-1111(a)(1) (2011), we affirm.

Louis, respondent's eighth child, was born in December 2011. At the time of Louis' birth, respondent's five oldest children had been removed from her custody and placed in foster care following her arrest in 2009. She voluntarily relinquished her parental rights as to four of the children in July 2010, and the fifth child was placed in the custody of the paternal grandmother in August 2010. Respondent's sixth child, born in November 2009, was the subject of a Child Protective Services ("CPS") report in January 2010 following a series of domestic disturbances in the home. The paternal grandparents sought and were awarded custody of the child in February 2010. Respondent's seventh child was born in October 2010. She was removed from respondent's custody, adjudicated neglected, and placed with her paternal grandparents in 2011 after multiple CPS reports, including an incident in which respondent threatened to kill a social worker and two police officers.

Wake County Human Services ("WCHS") received two CPS reports concerning Louis in February 2012. The first report alleged a violent confrontation between respondent and her

roommate in the presence of their respective children. The second report, received one week later, described a verbal altercation in Louis' presence between respondent and Louis' putative father R.T., who was living with respondent in violation of her lease. The report further alleged that R.T.'s brother came to the residence following the incident and threatened respondent. The landlord reported complaints from neighbors about the level of noise caused by arguments and parties at the residence, and expressed concerns about the number of persons coming in and out of the residence and about respondent's "ability to provide safe care for the child."

On 21 February 2012, WCHS obtained non-secure custody of Louis and filed a juvenile petition alleging that he resided in an injurious environment and was thus a neglected juvenile as defined by N.C. Gen. Stat. § 7B-101(15) (2011). Respondent and R.T. consented to an adjudication of neglect entered by the district court on 11 April 2012. The consent order included findings consistent with the CPS reports and an additional finding that respondent "continues to demonstrate the same pattern of domestic violence, poor parenting skills, and mental health problems which caused the removal of her other seven children, and at the time of the filing of the petition [Louis],

her eighth child, was at risk of harm." The order made reference to respondent's pending charges for communicating threats and violating probation and recounted R.T.'s more extensive criminal history, including a 2011 conviction for assault with a deadly weapon and "a domestic violence incident with [respondent]" on 10 February 2012 for which he was incarcerated. In its disposition, the court ordered respondent to comply with her probation; "obtain and maintain independent housing sufficient to meet the needs of herself and her child;" participate in parenting classes and mental health services; "and demonstrate skills learned in her interactions with the child[.]"

The district court ceased reunification efforts and changed Louis' permanent plan from reunification to adoption by order entered 12 February 2013. In addition to noting respondent's ongoing volatile relationship with R.T. and lack of stable housing, the court found that she "continues to demonstrate severe anger management problems and associate with inappropriate persons, such as her mother, with whom she was with when recently arrested for shoplifting." As evidence of respondent's inability "to control her emotions, even in controlled settings[,]" the court cited respondent's "eruption"

during the permanency planning hearing, which required her "to be restrained by law enforcement officials and asked to leave the Courthouse."

WCHS filed a motion to terminate respondent's parental rights on 13 March 2013, alleging three grounds for termination: (1) neglect; (2) failure to make reasonable progress to correct the conditions leading to Louis' removal from her care; and (3) dependency. *See* N.C.G.S. § 7B-1111(a)(1), (2), (6) (2011). After hearing evidence on 4 June 2013, the court adjudicated grounds for termination based on neglect and lack of reasonable progress under N.C.G.S. § 7B-1111(a)(1) and (2), and further determined that termination of respondent's parental rights was in the best interest of the minor child.[2] Respondent appeals.

_____

Respondent has filed a petition for writ of certiorari asking this Court to review the termination order notwithstanding her trial counsel's failure to sign her otherwise timely notice of appeal filed 25 July 2013. *See* N.C.R. App. P. 3.1(a)(1) ("[B]oth the trial counsel and appellant must sign the notice of appeal, and the appellant

_____

[2] The court terminated the parental rights of R.T. on the same grounds; R.T. is not a party to this appeal.

shall cooperate with counsel throughout the appeal."). It appears counsel's failure to sign the notice was the product of confusion about the scope of his representation.

This Court has previously held that Rule 3.1 is "jurisdictional, and if not complied with, the appeal must be dismissed." *In re L.B.*, 187 N.C. App. 326, 332, 653 S.E.2d 240, 244 (2007). Assuming arguendo that counsel's failure to sign a notice of appeal under Rule 3.1(a)(1) is a jurisdictional defect requiring dismissal, we find that respondent clearly evinced her intent to appeal by signing and filing notice within the statutory appeal period. Accordingly, we allow her petition for the purpose of reviewing the termination order. *See In re I.T.P-L.*, 194 N.C. App. 453, 460, 670 S.E.2d 282, 285 (2008) (issuing a writ of certiorari "to permit consideration of [respondents'] appeals on the merits so as to avoid penalizing [them] for their attorneys' errors.").

On appeal, respondent challenges the adjudication of grounds to terminate her parental rights based on neglect under N.C.G.S. § 7B-1111(a)(1). Specifically, she argues the district court erred in finding clear and convincing evidence of a "probability of a repetition of neglect" if Louis were returned to her care. *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227,

232 (1984).

In reviewing an adjudication under N.C. Gen. Stat. § 7B-1109(e) (2011), we determine whether the district court's findings of fact are supported by clear, cogent and convincing evidence, and whether the findings support the court's conclusions of law. *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). "If there is competent evidence, the findings of the trial court are binding on appeal[,] . . . even though the evidence might support a finding to the contrary." *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003) (citations omitted). The appellant is bound by any unchallenged findings of fact. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citation omitted). Moreover, "erroneous findings unnecessary to the determination do not constitute reversible error" where the adjudication is supported by sufficient additional findings grounded in competent evidence. *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006) (citation omitted). We review conclusions of law *de novo*. *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006) (citation omitted).

A neglected juvenile is one who "does not receive proper care, supervision, or discipline . . .; or who is not provided

necessary medical care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2013). In order to support an adjudication under N.C.G.S. § 7B-1111(a)(1), "[n]eglect must exist at the time of the termination hearing[.]" *In re C.W.*, 182 N.C. App. 214, 220, 641 S.E.2d 725, 729 (2007). Where "the parent has been separated from the child for an extended period of time, the petitioner must show that the parent has neglected the child in the past and that the parent is likely to neglect the child in the future." *Id.* The determination that a child is neglected is a conclusion of law. *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997).

The district court heard testimony from WCHS foster care social worker Toni Marshall and respondent. It also took judicial notice of all material "in the underlying file for which judicial notice is appropriate[.]" Based on this evidence, the court made the following findings pertinent to adjudication under N.C.G.S. § 7B-1111(a)(1):

> 10. [Louis was] adjudicated as a neglected juvenil[e] . . . pursuant to a consent [sic] entered by the parties, dated April 11, 2012.
>
> 11. [Respondent], who has had 8 children in all, had a history of mental health

problems, domestic violence, and instability which had resulted in her children being adjudicated as neglected children. All the children were placed with others, some in adoptive placements, pursuant to her signing relinquishments, and others in relative placements.

12. [Respondent] and [R.T.] engaged in several very serious domestic violence incidents, and [respondent] continued a pattern of poor parenting skills and associating with persons who created safety risks for the child. [R.T.], the father, was also involved in an incident of domestic violence with his mother and was incarcerated.

. . .

20. Subsequent to the adjudication [respondent] and [R.T.] continued a pattern of domestic violence, several incidents being quite serious. . . .

21. [R.T.] . . . engaged in a boisterous altercation with [respondent] at a November 2012 planning meeting at WCHS. . . .

. . .

25. [Respondent] has consistently visited her child in accordance with her visitation plan.

26. [Respondent] states that she is no longer in a relationship with [R.T.], and she did take out a domestic violence protective order against him. However, [respondent] has not stopped seeing and calling [R.T.]. She is due to deliver a child in September of 2013, and she states that [R.T.] is the father of the child. The

child was probably conceived in late November or early December 2012.

27. Since the adjudication, [respondent] has been charged with two counts of larceny (one pending), and she was therefore in violation of a [sic] her probation from another charge. She is awaiting trial on the pending charges.

. . .

28. [Respondent] began to engage earnestly in therapy in November 2012 with Upward Change Services, who also work with her medication management; however, she has not demonstrated that she is able to control her emotions sufficiently to provide a safe environment for the child.

29. Although [respondent] in November 2012 began in earnest to engage in services ordered by the Court, she has not demonstrated that she has corrected the conditions which have resulted in her losing custody of her 7 older children and the removal of [Louis] in February 2012.

30. [Respondent] continued to demonstrate severe anger management problems and associate with inappropriate persons, such as her mother, with whom she was with when she was arrested for shoplifting.

31. [Respondent] was still living with [R.T.] when she obtained new housing in November 2012, and he didn't leave the home until after the November 2012 planning meeting. She indicated that she was "through" with him, but soon after the huge argument she had with him at that . . . meeting, she was seen with [R.T.] in the community.

32. In January 2013, [R.T.] entered [respondent's] home and tried to suffocate her with a pillow . . . . [Respondent] filed for a[nd] received a Domestic Violence Protective Order. The domestic violence incidents reflect a continual repetition of behaviors that raise grave concerns that she is not able to safely care for the child. In addition, she erupted at the January 2013 Court proceeding and exemplified for the Court that she is not able to control her emotions, even in controlled settings. She had to be restrained by law enforcement officials and [was] asked to leave the Courthouse. . . . [S]he still calls [R.T.], has gotten into a car for rides with him, and is due in three months to have his baby. She has not demonstrated that she understands the impact of domestic violence on her child.

33. [Respondent] had housing at the beginning of this matter, but was evicted due to not complying with the rules of the apartment complex. . . . She was homeless for a long period of time and found a home in November 2012. The home is damaged and not suitable for habitation. There is black mold, floors are falling in, there are appliance problems, and water problems. [Respondent] has secured the assistance of legal aid to help bring a case against the landlord. Throughout her 3 year involvement with WCHS she has moved from place to place. She has not demonstrated the ability to maintain stability in her housing.

34. [Respondent] began engaging in a parenting program, Families on the Grow with Maria Weeks, who did some "home" visits with [respondent] one on one after [respondent] was evicted and moved to a motel. Once

> [respondent] moved to Wendell, NC she did not attend the classes, and claimed that she had no transportation. Transportation vouchers were offered to her. The Court did not find this to be a valid excuse for not attending an essential program.
>
> 35. In light of the findings above it is probable that [respondent's] pattern of neglect would continue if the child were placed in her care.

Most of these findings are uncontested by respondent and, thus, are binding. *See Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. We address her exceptions below.

As to Finding 11, respondent asserts the district court heard no evidence regarding her mental health diagnoses or the circumstances surrounding the removal from her care of her seven other children prior to 2012. She does not contest the accuracy of the finding *per se*, but claims the court improperly relied upon this general statement about her history to support a "foregone conclusion" that her rights as to Louis should be terminated.

We conclude that Finding 11 was fully supported by the social worker's testimony at the termination hearing and the findings to which respondent consented at the time of Louis' original adjudication of neglect in April 2012. The court was free to consider respondent's history — including her prior

neglect of other children — in assessing the likelihood of her future neglect of Louis under N.C.G.S. § 7B-1111(a)(1). *See In re McLean*, 135 N.C. App. 387, 395, 521 S.E.2d 121, 126 (1999).

Respondent also challenges the portion of Finding 30 that she "continued to demonstrate severe anger management problems" and the related averment in Finding 28 that she "has not demonstrated that she is able to control her emotions sufficiently to provide a safe environment for the child." She casts these findings as based on just two incidents since the initial adjudication of neglect: her argument with R.T. at the November 2012 planning meeting and her "emotional meltdown in court" at the permanency planning hearing on 31 January 2013. Respondent makes a similar argument about Finding 32 and the court's reference to the risk posed to Louis by her involvement in domestic violence with R.T. Respondent insists that her argument with R.T. in November 2012 and the single incident when R.T. attempted to suffocate her in January of 2013 were insufficient to show a likelihood of a repetition of neglect, given that she had obtained a domestic violence protection order ("DVPO") against R.T. Likewise, while she concedes that she lacked suitable housing for Louis as stated in Finding 33, she emphasizes that her current housing problems were no longer

based on R.T.'s presence in her home or the type of issues with noise and domestic violence that resulted in the original adjudication of neglect.

We believe the aforementioned findings regarding respondent's emotional instability, involvement in domestic violence, and lack of stable and suitable housing are sufficient to support the court's ultimate finding of a probability of a repetition of neglect if Louis were returned to her care. *In re K.D.*, 178 N.C. App. 322, 329, 631 S.E.2d 150, 155 (2006) (affirming adjudication of neglect based on the respondent-mother's "struggles with parenting skills, domestic violence, and anger management, as well as her unstable housing situation"). We are unpersuaded by respondent's suggestion that the number of specific incidents detailed by the court is insufficient to demonstrate a pattern suggestive of a likelihood of future neglect. Viewed in their totality, and in the context of respondent's prior neglect of Louis' siblings, these findings support the court's adjudication under N.C.G.S. § 7B-1111(a)(1).

Respondent separately objects to the court's statement in Finding 30 that "she was seen with [R.T.] in the community" subsequent to their argument at the November 2012 planning meeting. She argues this finding was based improperly on a

dispositional finding from a prior order, which was not found by clear and convincing evidence and was supported only by double hearsay included in a WCHS report. *See generally In re A.K.*, 178 N.C. App. 727, 731, 637 S.E.2d 227, 229 (2006) (noting the different proof standards for adjudicatory and dispositional facts). Assuming, *arguendo*, that this finding lacked evidentiary support, any error was harmless. *See In re T.M.*, 180 N.C. App. at 547, 638 S.E.2d at 240—41. The court's remaining findings showed that respondent continued to have contact with R.T. after the domestic violence incident in January of 2013 and the issuance of the DVPO. Respondent testified that she rode to the termination hearing with R.T. We further note respondent consented to a finding in support of the April 2012 adjudication that her involvement in domestic violence was a factor in Louis' status as a neglected juvenile. Accordingly, the essential portion of Finding 32, that she failed to "demonstrate[] that she understands the impact of domestic violence on her child[,]" was fully supported by the evidence and other findings. Accordingly, the trial court's findings support the adjudication of grounds for termination of respondent's parental rights based on neglect under N.C.G.S. § 7B-1111(a)(1). Having upheld this ground for termination, we

need not review the court's adjudication under N.C. Gen. Stat. § 7B-1111(a)(2).  *See In re P.L.P.*, 173 N.C. App. 1, 8, 618 S.E.2d 241, 246 (2005) (citations omitted).

Affirmed.

Judges STEELMAN and DAVIS concur.

Report per Rule 30(e).