IN THE MATTER OF: ARIELLE McCABE

No. COA02-1030

(Filed 20 May 2003)

**Child Abuse and Neglect— Munchausen syndrome by proxy—
substantial risk of serious physical injury**

The trial court did not err by adjudicating respondent mother's minor daughter abused and neglected, because: (1) the trial court weighed the conflicting inferences and determined that the minor was the victim of Munchausen syndrome by proxy, a form of child abuse with a substantial risk of morbidity and even mortality; and (2) the evidence and the trial court's findings demonstrated that there existed a substantial risk of serious physical injury to the minor child and that the minor child lived in an environment injurious to her welfare.

Appeal by respondent from order entered 6 April 2001 by Judge Henry L. Stevens, IV, in Onslow County District Court. Heard in the Court of Appeals 16 April 2003.

*Lanier & Fountain, by Timothy R. Oswalt, for respondent appellant.*

*James W. Joyner for petitioner appellee.*

TIMMONS-GOODSON, Judge.

Karrie McCabe ("respondent") appeals from an order of the trial court adjudicating her minor daughter ("juvenile") abused and neglected. For the reasons stated herein, we affirm the order of adjudication.

The facts pertinent to the instant appeal are as follows: Respondent is the natural mother of juvenile, who was born 24 May 1999. On 18 January 2001, Thomas McCabe ("McCabe"), respondent's former husband and the natural father of juvenile, served respondent with a civil domestic petition of custody for juvenile.

On 9 February 2001, the Onslow County Department of Social Services ("DSS") filed a petition alleging juvenile to be abused and neglected, on the grounds that juvenile was admitted to a hospital on 29 January 2001 for a history of intermittent episodes of cyanosis, or "blue spells." Respondent told admitting hospital physicians that

IN RE McCABE

[157 N.C. App. 673 (2003)]

juvenile's hands and feet, as well as the area around her mouth, had turned blue numerous times within the previous days, and that respondent brought juvenile to the hospital after she lost consciousness during the latest incident. Respondent asserted that juvenile was particularly likely to exhibit such symptoms when cold, and that she was lethargic and unresponsive during such episodes. According to respondent, juvenile had exhibited these symptoms since her "neonatal period." Treating physicians later diagnosed juvenile's condition as being possibly induced by respondent. DSS therefore requested that custody of juvenile be placed with McCabe, and that any visitation between respondent and juvenile be supervised. The trial court issued an order for nonsecure custody placing physical custody of juvenile with McCabe.

The adjudication hearing was held before the trial court on 29 March 2001, at which time the following evidence was presented: Dr. Elaine Kabeanfuller ("Dr. Kabeanfuller"), a pediatrician specializing in the treatment of abused children, testified to a form of child abuse known as Munchausen syndrome by proxy. Dr. Kabeanfuller explained that Munchausen syndrome by proxy

> was first described in 1977 by a Dr. Roy Meadow. . . . [H]e was the first one to put case reports out in the literature [and] since then there have been hundreds of case reports and many reviews and actual books written on the subject. It is a case where we often see children where they have . . . either a parent or caretaker [who] will either simulate or induce an illness in the child, present them for medical care multiple times, [and] often . . . deny any knowledge of . . . the symptoms or the signs, what their etiology is and then when that child is removed from that caretaker or parent's care, these signs and symptoms abate and no longer occur.

Dr. Kabeanfuller testified that she became involved in the present case in February of 2001 after the hospital physicians who were treating juvenile requested her consultation on the case. After observing juvenile, interviewing respondent and treating health care professionals, reviewing juvenile's medical history as well as records from juvenile's daycare providers, and consulting other medical experts, Dr. Kabeanfuller opined that juvenile possibly suffered from Munchausen syndrome by proxy. Dr. Kabeanfuller specifically based her opinion on the fact that juvenile's cyanotic episodes, witnessed by her daycare providers and reported by respondent as

occurring "every day" before juvenile's hospitalization, occurred only after juvenile had been in the exclusive care of respondent. Numerous medical procedures revealed no organic abnormalities in the child, and juvenile never exhibited any symptoms during her eleven days in the hospital. When she later learned during her testimony that juvenile had shown no sign of the symptoms reported by respondent since being removed from respondent's care, Dr. Kabeanfuller altered her diagnosis from "possible" Munchausen syndrome by proxy to "probable."

Dr. Kabeanfuller further stated that juvenile also potentially suffered from "Vulnerable Child Syndrome," which she explained as

a syndrome we sometimes see in pediatrics where a child who is otherwise well and healthy is presented multiple times for medical care by a parent or caretaker who is convinced that the child is ill or has some serious symptoms and requires a lot of reassurance by the physicians or medical personnel but in fact there is no organic disease process going on in the child.

Dr. Kabeanfuller noted that

[t]here's a continuum of an illness going from Vulnerable Child all the way to Munchausen syndrome where you have Vulnerable Child where the child actually is well and the parent is just overly concerned, and then the next, it can evolve into a Munchausen syndrome by proxy, um, type situation because you can have a child whose parents or caretaker believes that they're ill when they truly are not or may, may evolve into a parent who creates symptoms or fabricates a history in order to present that child to various physicians and receive various medical procedures.

The risk of morbidity or mortality associated with Munchausen syndrome by proxy, according to Dr. Kabeanfuller, is fifteen to thirty percent. This form of abuse may also lead to survivors being "very fearful, and they often have some psychological illnesses of their own, later on." Dr. Kabeanfuller added that, during her hospitalization, juvenile underwent extensive, painful, and invasive medical procedures to determine the source of the symptoms described by respondent.

Dr. Dale Newton ("Dr. Newton"), a pediatrician and expert in child abuse, testified on behalf of DSS. Dr. Newton treated juvenile during her hospitalization and concurred with Dr. Kabeanfuller's diagnosis of Munchausen syndrome by proxy as probable. Dr. Newton tes-

tified that he became juvenile's primary treating physician when respondent dismissed juvenile's original physician, Dr. Stephen Boyce Coker ("Dr. Coker"), after Dr. Coker diagnosed juvenile as suffering from Munchausen syndrome by proxy. During her hospitalization, juvenile underwent numerous medical procedures to screen out any possible organic abnormality. In Dr. Newton's opinion, juvenile's cyanotic episodes were potentially induced by either smothering or administration of a toxin. Dr. Newton agreed with Dr. Kabeanfuller that returning juvenile to the care of respondent would put juvenile at risk of harm.

Dr. Coker, a pediatric neurologist, gave further testimony. Dr. Coker stated that he examined juvenile on 25 January 2001 when respondent brought her to the hospital. Based on respondent's reports of frequent cyanotic episodes, Dr. Coker originally believed juvenile to be suffering from a form of epilepsy, but changed his diagnosis to Munchausen syndrome by proxy after medical procedures revealed no abnormalities and juvenile exhibited no symptoms after five days in the hospital. After Dr. Coker advised respondent of his diagnosis, she requested his removal as juvenile's treating physician.

Stephanie Leger ("Leger"), a registered pediatric nurse, testified that while juvenile was under her care at the hospital, respondent attempted to induce a cyanotic episode in juvenile by giving the child popsicles. Respondent asked Leger "what did [she] think would happen when [respondent] put [the popsicles] in [juvenile's] hand?" Respondent then placed two wrapped popsicles in juvenile's grasp and asked Leger if she observed juvenile's "feet . . . turning colors, her hands turning violet colors." Despite respondent's insistence that juvenile was "turning blue," Leger did not observe any blue or violet discoloration.

Respondent presented testimony by Dr. David Hannon ("Dr. Hannon"), a pediatric cardiologist. Dr. Hannon consulted with juvenile's physicians during her hospitalization and diagnosed juvenile as suffering from what he labeled as "benign paroxysmal acrocyanosis." Dr. Hannon explained

> [t]hat's simply a linking of three terms, benign would indicate that I believe that children who do this do not have a serious medical illness. Paroxysmal is just a medical word meaning that it occurs very suddenly and acrocyanosis means that [you're] blue but distally blue in the hands and feet. So this is not an established medical diagnosis although I have written a small piece for an

educational thing to the American Academy of Pediatrics on it mainly because I think that it probably, well I know that something like this does occur, whether my understanding of physiology is correct or not, I can't say.

Dr. Hannon testified that he had witnessed two other patients in the past who exhibited bluish discoloration similar to juvenile's. Dr. Hannon stated that he was "not particularly surprised" that juvenile had shown no further discoloration since her removal from respondent's care, because benign paroxysmal acrocyanosis tends to "have a spontaneous resolution." Dr. Hannon conceded that benign paroxysmal acrocyanosis and Munchausen syndrome by proxy are not mutually exclusive, and that juvenile might be suffering from both.

Dr. James Gant ("Dr. Gant"), juvenile's primary pediatrician, testified on behalf of respondent. Dr. Gant stated that juvenile had been his patient since birth, and that she had grown and developed normally. Dr. Gant referred juvenile to Dr. Coker

because of the descriptions that we have from the day care center, there's a note in her chart from the day care workers and they described lethargy and some other symptoms that didn't seem to fit with the cardiac type of problem and so my main concern was that she had possibly a seizure disorder because she was lethargic either during or after and they said "unresponsive" and I don't know, you know, for a fact, that's what she was because we didn't witness the episode.

Dr. Gant agreed with Dr. Hannon's diagnosis of benign paroxysmal acrocyanosis, but nevertheless recommended a psychological evaluation for respondent because she was "so hysterical and anxious and nervous and overly, almost paranoid about us taking the baby away and how things were going" and that "if you are histrionic or [overly] anxious or nervous, that does affect the child and it [a]ffects how they respond." Dr. Gant testified that he had spoken with respondent about the fact that her two other children were no longer in her custody. When asked about Munchausen syndrome by proxy, Dr. Gant responded "that's something that I don't know that I can say." Dr. Gant also admitted that he considered "taking a restraining order out on [respondent]" because

she was at our office so many times and she was very histrionic, um, it was causing a lot of problems because we couldn't actually keep functioning, but we were trying to support her and the only

IN RE McCABE

[157 N.C. App. 673 (2003)]

reason we didn't was because I know she was stressed out. I knew she was very anxious and I felt like, well maybe this would help her deal with it a little bit, um, so we just kind of kept, I talked to all the other physicians in the practice and we all agreed that, you know, we'd kind of just work with her. And she did come in numerous times when we didn't have appointments or things like that.

Ann Bell ("Bell"), a pediatric nurse employed by Dr. Gant's office, testified that she witnessed a cyanotic episode in juvenile. On 27 August 2000, respondent brought juvenile to the office. Bell stated that juvenile

was sitting on the table, the exam table, in her diaper . . . and she was fine and then all of a sudden she just started to turn blue [and] she got cold. And I felt her legs and her arms and I went and got [a physician]. [The blue color] started from the very tips of her fingers and her toes and it just gradually went up to the trunk of her body and she had some bluish tinge around her lips.

Bell stated that the discoloration lasted from fifteen to twenty minutes, during which juvenile remained active and exhibited otherwise normal behavior.

Kathy Moore ("Moore"), a child care provider at juvenile's daycare, testified that juvenile twice exhibited symptoms of cyanosis after being dropped off at the school by respondent. Moore stated that juvenile was lethargic and "kind of out of it" with a "purple color and she was purple toned on her arms, her legs, and around her mouth." In both instances, juvenile's skin remained discolored for at least thirty minutes. Moore never observed these symptoms in juvenile at any other time of day. Debra Lewis ("Lewis"), a social worker with DSS, testified that, since juvenile's removal from respondent's care, there have been no further reports of any cyanotic episodes by juvenile.

Upon consideration of the evidence, the trial court found and concluded that there was clear, cogent and convincing evidence that respondent abused and neglected juvenile, and that it was in the best interests of juvenile to remain in the custody of her father. From the adjudication of abuse and neglect, respondent appeals.

---

Respondent argues on appeal that the trial court erred in determining that juvenile was abused and neglected, asserting that there

was insufficient evidence to support such a determination. We disagree and affirm the order of adjudication of the trial court.

When an appellant asserts that an adjudication order of the trial court is unsupported by the evidence, this Court examines the evidence to determine whether there exists clear, cogent and convincing evidence to support the findings. *See* N.C. Gen. Stat. §§ 7B-805, 807 (2001); *In re Allen*, 58 N.C. App. 322, 325, 293 S.E.2d 607, 609 (1982). If there is competent evidence, the findings of the trial court are binding on appeal. *See id; In re Smith*, 56 N.C. App. 142, 149, 287 S.E.2d 440, 444, *cert. denied*, 306 N.C. 385, 294 S.E.2d 212 (1982). Such findings are moreover conclusive on appeal even though the evidence might support a finding to the contrary. *See In re Hughes*, 74 N.C. App. 751, 759, 330 S.E.2d 213, 218 (1985). "The trial judge determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, he alone determines which inferences to draw and which to reject." *Id.*

Under section 7B-101 of our General Statutes, an abused juvenile includes "[a]ny juvenile less than 18 years of age whose parent . . . [c]reates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means[.]" N.C. Gen. Stat. § 7B-101(1) (2001). A neglected juvenile is one who

> does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C. Gen. Stat. § 7B-101(15) (2001).

After reviewing the record, we conclude that there was clear, cogent and convincing evidence to support the trial court's findings and conclusions concerning respondent's neglect and abuse of juvenile. Three physicians, two of whom were experts in the area of child abuse, testified that juvenile was the victim of Munchausen syndrome

by proxy, a form of child abuse with a substantial risk of morbidity and even mortality. During her hospitalization, juvenile repeatedly underwent numerous extensive, painful, and invasive medical procedures to determine the source of symptoms reported by respondent. Dr. Newton opined that respondent potentially induced these symptoms by either smothering juvenile or administering a toxin. None of the medical procedures revealed any organic abnormalities in juvenile, and she never exhibited any symptoms or "blue spells" during her eleven-day stay at the hospital. Nor has there been any resumption of symptoms since juvenile was removed from respondent's care. The only cyanotic episode witnessed in its entirety by an individual other than respondent occurred at Dr. Gant's office and was witnessed by Bell. Bell confirmed, however, that juvenile remained active and alert during this episode. In contrast, juvenile's daycare providers testified that juvenile was lethargic and unresponsive during such episodes, which only occurred shortly after juvenile was dropped off by respondent and the onset of which were never witnessed by the daycare providers.

Although the evidence presented by Dr. Hannon did raise conflicting inferences as to the cause of juvenile's cyanotic episodes, Dr. Hannon conceded that benign paroxysmal acrocyanosis and Munchausen syndrome by proxy are not mutually exclusive, and that juvenile might be suffering from both. The trial judge weighed the conflicting inferences and determined that juvenile was the victim of Munchausen syndrome by proxy. Because there was evidence to support these findings, they are binding on appeal. *See Hughes*, 74 N.C. App. at 759, 330 S.E.2d at 218. The evidence and the trial court's findings clearly demonstrated that there existed a substantial risk of serious physical injury to juvenile, and that juvenile lived in an environment injurious to her welfare.

In conclusion, we hold that there was clear and convincing evidence to support the trial court's adjudication of neglect and abuse by respondent. We therefore affirm the adjudication of the trial court.

Affirmed.

Judges BRYANT and GEER concur.