IN RE: C.J., M.C., and A.C., Minor Juveniles.
No. COA06-1300
Court of Appeals of North Carolina.
Filed February 6, 2007
This case not for publication
Cynthia G. Barnhill, attorney for petitioner-appellee Rowan County Department of Social Services.
Michael J. Reece, attorney for respondent-appellant.
Womble Carlyle Sandridge & Rice, PLLC, by Georgiana L. Yonuschot, attorney for C.J., M.C. and A.C., Minor Children, by and through their guardian ad litem.
MARTIN, Chief Judge.
On 22 June 2006, respondent father ("respondent") filed a notice of appeal with respect to the trial court's 13 June 2006 disposition order involving the minor children A.C., M.C. and C.J. On 17 July 2006, respondent filed an amended notice of appeal with respect to "all orders entered by the Honorable William C. Kluttz during May and June of 2006." On 27 November 2006, the Rowan County Department of Social Services ("DSS") filed a motion to dismiss the appeal. On 12 December 2006, this Court denied the motion to dismiss the appeal from the 13 June 2006 order, but allowed it as to any remaining orders encompassed by the amended notice of appeal. Respondent father's petition for certiorari to review the orders as to which his appeal has been dismissed has also been denied. Consequently, the Court's review herein is limited to the two assignments of error addressed in respondent's brief that are specifically related to the 13 June 2006 disposition order as well as the trial court's prior adjudication order entered 9 June 2006.
A.C. is the biological child of respondent father and Mary Anne Campbell. M.C. is the biological child of Ms. Campbell and Buddy Allen Bentley. At the time the juvenile petitions were filed in this matter, Ms. Campbell was stationed in Korea with the U.S. military. Beginning in December 2005, A.C. and M.C., ages one and three years, respectively, were living with respondent, respondent's girlfriend, Rachel Klie, and Ms. Klie's eleven-month-old child, C.J. Though respondent was not the biological father of M.C. and C.J., he provided them with regular supervision and care.
On 9 February 2006, DSS filed two juvenile petitions with respect to A.C., M.C., and C.J. One petition alleged that C.J. had suffered non-accidental injuries of a fractured skull, a fractured femur and an abrasion of her chin while in the care of respondent and Ms. Klie. The second petition relating to A.C. and M.C. alleged that M.C. had sustained a cigarette burn to her left knee. After hearings on 23 and 28 March, 24 April and 8 and 11 May 2006, the trial court entered an order adjudicating A.C. and M.C. neglected and adjudicating C.J. both neglected and abused. With respect to this order, the respondent raises two assignments of error.
In his first assignment of error, respondent challenges the trial court's finding regarding the timing of C.J.'s skull fracture. Respondent's challenge requires this Court to determine whether there exists clear, cogent and convincing evidence to support the findings. See N.C. Gen. Stat. §§ 7B-805, 807. If there is competent evidence, the findings of the trial court are binding on appeal. In re McCabe, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003). Such findings are moreover conclusive on appeal even though the evidence might support a finding to the contrary. See id. "The trial judge determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, he alone determines which inferences to draw and which to reject." Id. (quoting In re Hughes, 74 N.C. App. 751, 759, 330 S.E.2d 213, 218 (1985)).
With respect to the fracture to C.J.'s skull and the timing of this injury, the trial court made the following findings:
9. When [respondent] kept [C.J.], he was responsible for the health and welfare of all three children in a residential setting and was thus their caretaker at such times.
10. [C.J.] suffered a fractured femur, fractured skull, and broken rib. These injuries likely occurred concurrently, and based upon her condition at the time of her medical examinations, these injuries could have been caused between January 20 and January 25, 2006. In addition, previously, she suffered a fracture of the other femur.
11. These injuries occurred by other than accidental means, and [C.J.] was diagnosed as suffering from Battered Child Syndrome based on these injuries.
*****
13. A fracture of the skull would require a concentrated blow to the head equivalent to a five foot fall onto the head. Respondent Rachel Klie first observed a knot on [C.J.]'s head on the night of January 22, 2006. This knot was on the left side toward the rear of her skull. This is the same location of the fracture observed by the treating physicians on January 24, 2006.
14. On January 24, 2006, the head was noticeably swollen.
15. It would take a "couple" of days for fluid to seep out, manifesting itself in a more visible swelling.
16. On January 23, 2006 respondents Rachel Klie and [respondent] took [C.J.] to stay with Rachel Klie's mother and stepfather. At that time the juvenile [C.J.] was fussy. During that day she slept a lot, cried and did not sleep well, and at 6:30 p.m., when Ms. Klie's mother returned from work, she found [C.J.] to be grouchy and "real warm," but assumed these symptoms were the result of teething.
17. Injuries to the skull and left femur are not consistent with explanations offered by [respondent and Rachel Klie], i.e., that he fell over on [C.J.] while teaching her to walk or that the juvenile [C.J.] bumped her head while taking a bath.
*****
19. On January 22, 2006 respondent . . . was the primary care giver of the three juveniles while respondent Klie was at work from 7:30 am until 2:30 pm.
Respondent contends that the trial court's finding that the skull fracture occurred before C.J.'s evening bath on 22 January 2006 while in the care of respondent and Ms. Klie is not supported by clear cogent and convincing evidence. We disagree.
At the hearing, DSS offered the testimony of Dr. Craig Barnes, a pediatric radiologist at Brenner's Children Hospital, part of Wake Forest University Medical Center. Dr. Barnes testified that radiology images of C.J. revealed several fractures, including a recent skull fracture. In offering his opinion regarding the age of each of the fractures, Dr. Barnes opined that the skull fracture occurred sometime between the 20th and 23rd of January based on the appearance of soft tissue swelling in the image which was taken on the 24th of January.
Respondent asserts that this expert's testimony provides greater support for the occurrence of the injury on the 23rd when C.J. was in the care of Ms. Klie's mother and stepfather, Carolyn and Charlie Stepp, rather than on the 22nd when C.J. was in the care of respondent and Ms. Klie. While Dr. Barnes did testify that dates more remote from the 24th were increasingly less likely to be the date of injury, he was referring specifically to the more remote dates of the 18th and 19th. He also testified that the injury would have occurred within one to two days of the x-ray and that he would not be surprised to learn that the injury shown on the x-ray had occurred on the 22nd. This expert testimony provides clear support for the trial court's determination that the injury occurred on the 22nd.
Nevertheless, the trial court did not rely solely upon the expert's testimony in determining that the fracture occurred on the 22nd. Also significant was Ms. Klie's testimony that she noticed a knot on C.J.'s head in the exact location of the skull fracture on the 22nd following C.J.'s bath. This swelling is consistent with the expert's testimony that swelling "occurs initially with the injury" usually "within hours and then certainly by the end of the first day."
The trial court also considered evidence that C.J. had suffered other unexplained fractures. Dr. Barnes testified that, in addition to the skull fracture, C.J. had a fractured right femur and a fractured rib that appeared to have occurred in the same time frame as the skull fracture. Dr. Barnes also testified that C.J. had a fracture of the left femur that had occurred approximately three to four weeks earlier than the right femur fracture.
Respondent further challenges the trial court's dating of the injury by asserting that the knot noted by Ms. Klie after C.J.'s bath on the 22nd was a separate injury and that respondent, Ms. Klie and a friend visiting on the 23rd testified that C.J. was active and playful on the evening of the 22nd and prior to going to the Stepps' on the 23rd. Despite respondent's contention, the trial court was free to determine the weight to be given to this testimony. In fact, the trial court made the following specific finding with respect to respondent's own credibility:
18. [Respondent's] credibility is impaired by numerous inconsistencies and contradictions in his statements, untruths, and previous convictions within ten years, including assault on a female and assault on a handicapped person, his brother, who has spina bifida.
In sum, the time frame of the injury provided by the expert witness combined with the timing of the swelling on C.J.'s head constitutes clear, cogent and convincing evidence that the injury occurred on the 22nd while C.J. was in the care of respondent and Ms. Klie. Accordingly, this assignment of error is overruled.
In his second assignment of error, respondent asserts that the trial court erroneously adjudicated A.C. and M.C. as neglected juveniles. The trial court made the following findings in support of this adjudication:
23. On or about January 22, 2006, respondent . . . burned juvenile [M.C.] with a cigarette. This caused a 1/4 inch circular "deep burn with a collar." It is unlikely that this was caused by the child's brushing up against the cigarette.
24. Respondent . . . changed his story in reference to [M.C.]'s cigarette burn, first stating that the burn was caused by her touching a heater. He later stated it was caused when she brushed up against his cigarette. At trial he testified it was caused when the "cherry" or hot tip stuck to her shin while they were pillow fighting.
25. The home with respondent . . .constitutes a dangerous environment.
26. [Respondent] is either a parent or caretaker of [M.C.].
27. The juvenile [A.C.] has also lived in the home with juveniles [M.C.] and [C.J.].
28. Rachel Klie, as parent, or [respondent], as caretaker, have inflicted or allowed to be inflicted upon [C.J.] a serious injury by other than accidental means OR has [sic] created or allowed to be created a substantial risk of serious physical injury to [C.J.] by other than accidental means.
*****
30. [M.C.] is a juvenile who does not receive proper care, supervision, or discipline from her parent or caretaker OR who lives in an environment injurious to her welfare. In reaching this conclusion, the Court considered the fact that she lives in a home where another juvenile ([C.J.]) has been subjected to abuse or neglect by an adult who regularly lives in the home.
31. [A.C.] lives in an environment injurious to her welfare. In reaching this conclusion, the Court considered the fact that she lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
It is clear from these findings that the adjudication of neglect for A.C. and M.C. was based on the trial court's finding that they lived in a home with C.J. who had suffered serious injury intentionally inflicted upon her by an adult living in the home. The statute defining "neglect" plainly permits a trial court to consider "whether that juvenile lives . . . in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7B-101(15) (2006); see In re A.B., ___ N.C. App. ___, ___, 635 S.E.2d 11, 15 (2006) (holding that purpose of the inclusion of this factor in the statutory definition of "neglect" was "to permit 'the trial court to consider the substantial risk of impairment to the remaining children when one child in a home has been subjected to abuse or neglect,'" (quoting In re McLean, 135 N.C. App. 387, 394, 521 S.E.2d 121, 126 (1999)).
Respondent's challenge to the adjudication of M.C. and A.C. as neglected juveniles relies upon his contention that there was no evidence to support the trial court's finding as to the abuse of C.J. As we have overruled respondent's assignment of error on that finding, his argument necessarily must fail. We further conclude that the trial court's finding that respondent burned M.C. with a cigarette provides additional support for the adjudication. Though respondent argues that the trial court's finding as to the cigarette burn is unsupported by the evidence, we disagree. The trial court was free to reject respondent's varying explanations for the burn as lacking credibility. Furthermore, child abuse expert Dr. Sara Sinal testified that the depth of the burn and the collar around the burn suggested a "forced burn" that was caused by a cigarette being "pressed into the child's skin." We conclude that this testimony constituted clear cogent and convincing evidence to support the trial court's finding that respondent intentionally burned M.C. Accordingly, respondent's second assignment of error is overruled.
Affirmed.
Judges WYNN and McGEE concur.
Report per Rule 30(e)