An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1260

NORTH CAROLINA COURT OF APPEALS

Filed: 20 May 2014

IN THE MATTER OF:

L.B.B.                                    Harnett County
                                          No. 13 J 29

Appeal by respondent-mother from orders entered 14 June and 30 July 2013 by Judge Addie H. Rawls in Harnett County District Court. Heard in the Court of Appeals 5 May 2014.

> *Duncan B. McCormick for petitioner-appellee Harnett County Department of Social Services.*
>
> *Levine & Stewart, by James E. Tanner, III, for respondent-appellant mother.*
>
> *Marie H. Mobley for guardian ad litem.*

BRYANT, Judge.

Respondent-mother appeals from orders adjudicating her daughter Lori[1] an abused and neglected juvenile and awarding

---

[1] Lori is a pseudonym used to protect the identity of the juvenile pursuant to N.C. R. App. P. 3.1(b).

custody of Lori to the Harnett County Department of Social Services ("DSS"). Because the District Court's findings of fact support an adjudication of abuse and neglect, we affirm the Court's orders.

Lori, born in September 2008, lived with her mother (respondent) and step-father. On the morning of 13 January 2013, Dunn Emergency Services was dispatched to the home after receiving a 911 call regarding Lori's seizure activity. Emergency paramedics reported that upon arriving at the home, they found

> [Lori] on a bed in a de-cerebrate posture with vomitus noted outside her mouth and she was making a choking sound. An attempt to open her airways was not successful because her jaw was clinched. Bruising of different coloration was noted on her neck, arms and chest with battle signs noted behind the child's ears. Her right pupil was blown, the left pupil was constricted; both eyes were pointing left.

The paramedics concluded that Lori had a serious, life-threatening injury caused by significant head trauma, and transported her to Betsy Johnson Regional Hospital. Emergency room personnel at Betsy Johnson Regional Hospital noted that Lori remained unresponsive and non-alert during treatment.

After being medicated and intubated at Betsy Johnson Regional Hospital, Lori was airlifted to Duke University

Hospital where she subsequently underwent emergency brain surgery to treat a large subdural hematoma. Lori's neurosurgeons noted that the hematoma was so severe it had pushed her brain from the right to the left side of her skull. Lori's subdural hematoma was also found to contain hyper acute and acute blood, indicating that her subdural bleeding was only a few hours old at the time of her brain surgery.

DSS filed a juvenile petition on 23 January 2013, alleging that Lori was an abused and neglected juvenile. DSS alleged that respondent and the step-father did not have reasonable explanations for Lori's life-threatening head trauma and bruising, and that Lori's injuries were consistent with a child who has been abused. DSS took non-secure custody of Lori.

After hearing evidence on 31 May and 14 June 2013, the District Court adjudicated Lori an abused and neglected juvenile and awarded custody of Lori to DSS. Respondent appeals.

_____

Respondent contends the trial court's determination that Lori is an abused and neglected juvenile is not supported by the findings of fact or the evidence. We disagree.

"The purpose of abuse, neglect and dependency proceedings is for the court to determine whether the juvenile should be

adjudicated as having the status of abused, neglected or dependent." *In re J.S.*, 182 N.C. App. 79, 86, 641 S.E.2d 395, 399 (2007). Accordingly, the role of this Court in reviewing a trial court's adjudication of neglect or abuse is to determine "(1) whether the findings of fact are supported by 'clear and convincing evidence,' and (2) whether the legal conclusions are supported by the findings of fact." *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000) (citations omitted). If this evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary. *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003).

A neglected juvenile is one "who does not receive proper care, supervision, or discipline" from a parent or caretaker, or "who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2013). An abused juvenile is defined as, *inter alia*, a juvenile whose parent or caretaker "[c]reates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means[.]" *Id*. § 7B-101(1)(b) (2013).

The trial court made the following pertinent findings of fact:

11. Dunn Emergency Services Agency received a call for emergency services to the home at [] Dunn, NC at approximately 11:54 am January 13, 2013, with the 911 call referenc[ing] seizures. The agency's personnel arrived at the above residence at approximately 11:59 am and found the juvenile herein on a bed in a de-cerebrate posture with vomitus noted outside her mouth and she was making a choking sound. An attempt to open her airways was not successful because her jaw was clinched. Bruising of different coloration was noted on her neck, arms and chest with battle signs noted behind the child's ears. Her right pupil was blown, the left pupil was constricted; both eyes were pointing left. The EMS personnel immediately noticed that the injuries sustained by the minor child were life threatening, picked up the child and carried her to the ambulance, and transported her to Betsy Johnson Regional Hospital Emergency Room. During the time the emergency personnel were attending the juvenile[] she was unresponsive and not alert.

12. The juvenile was received at the emergency room of Betsy Johnson Hospital at approximately 12:08 pm January 13, 2013 in an unresponsive state; the juvenile's step father is recorded to have stated to the EMS that the juvenile "was in the car and she fell over and started having a seizure." The juvenile was lethargic and had de-cerebrate posturing and was observed to have multiple areas of bruising to the body to include the left jaw, neck and behind the ear and to the left abdomen, []upper arm thoracic area of the back, hip/flank area with small abrasion, left knee and to sup pubic area. Contact was made with physicians at Duke Hospital [and the juvenile] was accepted for transfer at

approximately 12:55 pm January 13, 2013. The juvenile was treated, medicated and intubated for air flight to Duke Hospital, whose life flight unit arrived for transport at approximately 13:28 (1:28 pm) and the juvenile was flown to Duke.

13. The juvenile was admitted to Duke Hospital at approximately 3:07 pm January 13, 2013 by Duke Life Flight. Upon her arrival at Duke, the juvenile underwent an emergency neurosurgical procedure due to a life threatening, large right side bleed in the subdural space between her brain and the inner surface of her skull. The mass effect of the subdural blood caused the child's brain to shift slightly from right to left within her skull (herniation of her brain). The subdural hematoma contained hyper acute and acute blood which indicated that her subdural bleed began close to the time she was presented to Betsy Johnson Hospital — thought to be during the early morning on January 13, 2013 and not later than the night before — the bleed being a few hours old at the time of her neurosurgical procedure.

. . .

15. The juvenile's step father provided the following history of events concerning the juvenile to the medical providers, to wit: On the day of January 13, 2013, the family slept until approximately 11 am; after getting up, the stepfather and the child decided to get some coffee. He reported that [Lori] had unbuckled her seat belt and "she stuck her hand in the door wedge, reaching out" and he "heard a shuffle." He did not see [Lori] fall, but when he turned around he "saw her laying on the ground, on her back" with her head "facing the front of the car." She looked like "she was rolling

over onto her side and attempting to get up." [Lori] "grimaced," but she didn't cry. The step father rubbed the back of her head and noted "it was huge. Like something swelling." He buckled [Lori] in her car seat and as he drove home [he heard] a loud "EEEeeee noise" and saw that "[Lori] threw her arm up." He pulled [Lori] into the front seat and tried to open her mouth and "blew air into her mouth." He stopped the car and "took both hands and tried to pry open her jaw." He "spread her body out" and "tried to force air manually. Took her lips and blew. Took a fist on her chest and tried to push." When he "heard a snore come out of her mouth" he held her and drove home. He "ran inside, told [respondent] and laid [Lori] on the bed." An ambulance was called and took [Lori] to the hospital. The stepfather told [respondent] that while at the gas station, [Lori] went to climb in the car and while shutting the door, she fell out of the car. He picked her up and on the way home she began having a seizure. He took her into the front seat and began CPR.

. . .

22. Pursuant to an exam by Duke Ophthalmology of the bruising around the juvenile's right eye, a small number of intra-retinal hemorrhages were observed in her right eye (same side as the subdural bleed) which is consistent with an impact injury to the head.

. . .

27. The life threatening head injury to [Lori], resulting in subdural bleeding and right to left herniation of her brain is not adequately explained by the alleged falling out [of] the back seat of the family car. The respondent mother and stepfather have

denied that [Lori] had other recent falls or accidents. [Lori's] head injury and subdural bleeding began a few hours prior to her presentation at Betsy Johnson and Duke Hospitals. The subdural bleeding and the brain injury are consistent with head trauma by non-accidental means.

28. The Respondent mother and stepfather have been the primary caretakers of the juvenile since August 2012 and especially for the period of the week prior to January 13, 2013.

29. Juvenile [Lori] suffered significant loss of speech and language skills as a result of the injuries she received. The juvenile benefitted greatly with the therapy sessions received at the Vidant center and was discharged from that center on March 12, 2013.

30. The injuries sustained by the juvenile on or about January 13, 2013 were the result of non-accidental trauma. But for the immediate medical attention given to the child by the emergency response team, the child would have either died or been in a vegetative state.

Of the above findings of fact, respondent challenges finding of fact 27 as not supported by the evidence. We conclude the finding is based upon the testimony of Dr. Karen St. Claire, an expert in child abuse and pediatric medicine and Director of the Duke Child Protection Team, who consulted with Lori's neurosurgeon Dr. Herbert Fuchs. Dr. St. Claire testified on direct examination as follows:

Her head injury is an injury that would have taken [] what we call focal force, an impact force to create. I can't rule out that there were rotational forces with that. It took a fair amount of force to cause the shearing and tearing of the vessels that caused this large subdural hematoma.

The history of this child falling out of the car, she may or may not have fallen out of a car, but it's not felt that that short fall has created this serious head injury with the shearing of these vessels. And again, Dr. Fuchs's opinion is consistent with that, and he was able to see the actual bleeding vessels that were causing the subdural hematoma, and the timing for that would've been around a few hours prior to her presenting to our hospital and our operating room, and we felt that this was not from a simple, short fall.

Dr. St. Claire further testified on cross-examination:

Certainly my training and expertise tell me that most children who have short falls, most of them will not have serious brain damage or bleeding around their brain, that, if they do, it tends to be minimal, not requiring surgery.

So this is something that's not typical for accidental short fall. Dr. Fuchs's opinion was also that this was not consistent with a simple, short fall due to the amount of trauma that she had sustained.

. . .

[Lori's head injury] is not consistent with an accidental injury, short fall as described.

Based upon Dr. St. Claire's testimony, the trial court did not err in making finding of fact 27, and respondent's argument is without merit.

Respondent challenges additional findings of fact made by the trial court. We need not address respondent's additional arguments, however, as the trial court's other findings of fact are unnecessary to support its ultimate conclusions, and any error in them would not constitute reversible error. *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240—41 (2006). Indeed, the uncontested findings of fact, together with the finding affirmed above, establish that Lori was airlifted to Duke University Hospital for a life-threatening head injury; that Dr. St. Claire concluded the head injury and subdural bleeding were caused by non-accidental means; that neither respondent's nor the step-father's explanation was consistent with the injuries observed; that respondent and the step-father were Lori's primary caretakers when the injuries occurred; and that Lori's speech and language skills were impaired due to the injury. These findings support the trial court's conclusions of law that Lori was an abused juvenile in that respondent created or allowed to be created a substantial risk of serious physical injury to Lori by other than accidental means, and Lori was a

neglected juvenile in that she did not receive proper care or supervision from respondent.  Accordingly, the trial court did not err in its adjudication, and the trial court's orders are affirmed.

Affirmed.

Judges STEPHENS and DILLON concur.

Report per Rule 30(e).