IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-54

Filed: 3 July 2018

Durham County, No. 17 J 80-81

IN THE MATTER OF: C.C., A.S.

Appeal by respondent from orders entered 21 September 2017 and 2 October 2017 by Judge Doretta L. Walker in Durham County District Court. Heard in the Court of Appeals 6 June 2018.

> *Senior Assistant County Attorney Bettyna B. Abney for petitioner-appellee Durham County Department of Social Services.*
>
> *Edward Eldred for respondent-appellant.*
>
> *Melanie Stewart Cranford for guardian ad litem.*

DAVIS, Judge.

In this case, we revisit the issue of whether a child can properly be adjudicated as neglected where she has been in a stable voluntary placement outside of her parents' home for an extended period of time prior to the filing of a neglect petition. C.C. ("Respondent") appeals from the trial court's orders adjudicating his daughter, C.C. ("Clarissa"),[1] as a neglected juvenile. Because we conclude the trial court properly determined that Clarissa was a neglected juvenile, we affirm.

---

[1] Pseudonyms and initials are used throughout this opinion for the privacy of the minor children and for ease of reading.

## Factual and Procedural Background

A.S. ("Anna")[2] gave birth to Clarissa on 7 December 2014. Respondent is Clarissa's putative father. Respondent was incarcerated at the Wake County Correctional Center at all times relevant to this case. When Clarissa was approximately six months old, she began living with Anna's foster mother ("Ms. L."). Clarissa continued living with Ms. L. until December 2016.

On 7 November 2016, Wake County Human Services ("WCHS") received a Child Protective Services report that Clarissa had been neglected while in Anna's care. The report included allegations of "substance abuse, mental health [issues], unstable housing, prostitution by the mother, . . . and inappropriate supervision, as [Clarissa] was left in a hotel (Days Inn) room by herself."

Clarissa's half-sister, A.S. ("Alice"),[3] was born on 12 December 2016. Around this time, Anna decided that Clarissa would live with Respondent's mother ("Ms. C.").

The case was transferred to the Durham County Department of Social Services ("DSS") on 30 January 2017 upon WCHS becoming aware that Anna and Alice had relocated to Durham. On 9 February 2017, Anna was accepted into the Cascade Treatment Program of Durham ("Cascade"), and she began living at Cascade along with Alice. During this time, Clarissa was living with Ms. C. and was allowed to visit

---

[2] Anna is not a party to this appeal.

[3] Respondent is not Alice's father.

Anna at Cascade on the weekends. During her stay at Cascade, Anna tested positive for illegal drugs on eleven out of thirteen drug tests.

On 17 April 2017, Cascade informed DSS of an incident in which Anna had been permitted to leave the agency "on a pass with an expected return of 8:00 p.m." but had instead returned to the agency "around 1:45 a.m.[,] . . . long after curfew, and appeared intoxicated when she returned." Anna was informed on 18 April 2017 that she would be discharged from Cascade "due to continuously testing positive for illegal substances."

On 19 April 2017, a DSS employee informed Anna that due to her continued substance abuse it intended to file a petition seeking custody of her children and asked Anna who she would prefer to care for them. Anna requested that Clarissa and Alice be placed back with Ms. L. DSS subsequently approved a kinship assessment with Ms. L., and both children began living with her.

On 21 April 2017, Anna was discharged from Cascade. DSS filed a juvenile petition on 25 April 2017 alleging that Clarissa and Alice were neglected juveniles.

On 16 May 2017, Anna called Latisha Martin, a DSS social worker, and informed Martin that "she wanted to go to New Jersey, where she believed she could better access the services needed to sustain recovery." She asked Martin if the children could be placed with Alice's paternal grandmother ("Ms. B.") in New Jersey. Martin replied that Ms. B.'s status as a relative would have to be confirmed through

paternity testing and that a request under the Interstate Compact on the Placement of Children would need to be sent to New Jersey before the children could be placed with Ms. B.

On 17 May 2017, DSS sought an order for non-secure custody as to Clarissa and Alice and filed a supplemental petition for neglect, alleging that Anna was making arrangements to immediately remove the children from their placement with Ms. L. and take them to New Jersey. The supplemental petition stated that the children were "exposed to a substantial risk of serious physical injury or sexual abuse" because "the mother is threatening to remove the children [from Ms. L's care] immediately."

An adjudication hearing on DSS's petition for neglect was held on 14 June 2017 before the Honorable Doretta L. Walker in Durham County District Court. Martin and Anna testified at the hearing. A dispositional hearing was held on 17 and 18 July 2017. On 21 September 2017, the trial court issued an order (the "Adjudication Order") finding Clarissa to be a neglected juvenile. On 2 October 2017, the court entered a second order (the "Disposition Order") determining that it was in Clarissa's best interests to remain in the care of Ms. L. and continuing legal custody of Clarissa with DSS. Respondent file a timely notice of appeal as to both the Adjudication Order and the Disposition Order.[4]

---

[4] Although the trial court also adjudicated Alice as a neglected juvenile, that portion of the court's ruling is not at issue in this appeal.

**Analysis**

On appeal, Respondent contends that the trial court erred by adjudicating Clarissa to be neglected based on his argument that the court made no finding in the Adjudication Order that Clarissa was at a substantial risk of impairment and that the evidence would not have supported such a finding. At the outset, we note that it is undisputed by the parties that Respondent is unable to care for Clarissa because of his incarceration. For this reason, the parties devote their arguments to the issue of whether Clarissa meets the definition of a neglected juvenile based on the actions of Anna.

We review the trial court's order of adjudication to determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re Q.A.*, 245 N.C. App. 71, 73-74, 781 S.E.2d 862, 864 (2016) (citation, quotation marks, and brackets omitted). Findings of fact that are supported by competent evidence or are unchallenged by the appellant are binding on appeal. *In re A.B.*, 245 N.C. App. 35, 41, 781 S.E.2d 685, 689, *disc. review denied*, 369 N.C. 182, 793 S.E.2d 695 (2016). "Such findings are . . . conclusive on appeal even though the evidence might support a finding to the contrary." *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003). We review a trial court's conclusions of law *de novo*. *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006).

A neglected juvenile is defined as "[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker . . . ." N.C. Gen. Stat. § 7B-101(15) (2017). "[T]his Court has consistently required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993).

However, even where the trial court makes no finding that a juvenile has been impaired or is at substantial risk of impairment there is no error if the evidence would support such a finding. *See In re H.N.D.*, 205 N.C. App. 702, 706, 696 S.E.2d 783, 786 (Wynn, J., dissenting) (holding that reversal was improper despite lack of ultimate finding where all the evidence supported adjudication of neglect based on substantial risk of impairment), *rev'd per curiam for reasons stated in dissent*, 364 N.C. 597, 704 S.E.2d 510 (2010); *In re Padgett*, 156 N.C. App. 644, 648, 577 S.E.2d 337, 340 (2003) ("Where there is no finding that the juvenile has been impaired or is at substantial risk of impairment, there is no error if all the evidence supports such a finding."); *Safriet*, 112 N.C. App. at 753, 436 S.E.2d at 902 ("Although the trial court failed to make any findings of fact concerning the detrimental effect of [parent's] improper care on [child's] physical, mental, or emotional well-being, all the evidence supports such a finding.").

In the present case, the trial court made the following pertinent findings of fact:

> 5.      [Respondent], putative father of [Clarissa], is a resident of North Carolina.  He has lived in North Carolina for over six months prior to the filing of the petition.  [Respondent] is incarcerated within the North Carolina Department of Corrections ("NCDOC") system. . . .      [Respondent] is at the Wake County Correctional Center in Raleigh, NC.  [Respondent] was served the petitions in the following manner: personal service by Sheriff Deputy on June 14, 2017.

> . . . .

> 8.      The children are neglected in that they are not receiving proper care, supervision, or discipline from the parent, guardian, custodian, or caretaker and live in an environment injurious to their welfare with the parents.

> 9.      On November 7, 2016, Wake County Human Services received a CPS report alleging neglect of the minor child, [Clarissa].  Concerns noted in the allegations included substance abuse, mental health, unstable housing, prostitution by the mother, [Anna], and inappropriate supervision, as [Clarissa] was left in a hotel (Days Inn) room by herself.

> 10.      On December 16, 2016, another CPS report was made due to [Anna] giving birth to [Alice] on December 12, 2016.  [Anna] tested positive for cocaine at the birth of [Alice].  [Anna] was not required by Wake County DSS to identify any safety resource for [Alice]; however, she continued to allow [Clarissa] to reside with [the] child's putative paternal grandmother, [Ms. C.].  Wake County DSS completed a kinship assessment on [Ms. C.]'s home on or about March 30, 2017[.]

> 11.      [Clarissa] was living with [Ms. C.] when

Durham DSS received the case. She brought [Clarissa] to Cascades [sic] on the weekends to stay with [Anna] and [Alice]. At some point in April 2017, when [Ms. C.] arrived to pick up [Clarissa], [Anna] chose to keep [Clarissa] with her. [Anna] later moved [Clarissa] to the care of [Anna]'s former foster mother, [Ms. L.]. [Clarissa] is two years old now. [Anna] had concerns about the quality of care [Clarissa] was receiving from [Ms. C.] while at Cascades [sic].

12. On December 21, 2016, a case decision of "services needed" for In-Home Services to address [Anna]'s substance abuse issues, parenting skills, and mental health needs was made. Durham County DSS received the case from Wake County DSS on January 30, 2017, stating that [Anna] and [Alice] had relocated to Durham County.

13. [Anna] has two older children . . . who both have been cared for by other individuals due to [Anna]'s instability. Both of these children have been out of [Anna]'s care since they were infants/ toddlers. . . . [Anna] is uncertain where the children are located at this time. Neither child was included on the Wake County CPS report that Durham County DSS received. Arrangements for her other children were made without DSS's intervention.

14. During [Anna]'s initial encounters with Durham DSS Social Worker Latisha Martin, [Anna] admitted that her substance abuse was a major barrier towards her stability and that she was open to entering a mother-child substance abuse treatment program. [Anna] has an extensive history of illegal drug use and instability. [Anna], along with [Alice], w[as] accepted and entered into Cascade Treatment Program of Durham on February 9, 2017. During [Anna]'s stay at Cascade, she tested positive for illegal drugs on 11 out of 13 drug tests. The substances included alcohol, cannabis, and various opiates. Cascade screened [Anna] on several occasions. [Anna] was enrolled in the residential substance abuse treatment program at Cascade, and remained there for about two and half [sic]

months (February 9, 2017 until April 21, 2017). [Anna]'s suboxone/opiate maintenance treatment was outsourced to Hope Center for Advancement, while she was at Cascade. Two weeks prior to her discharge from Cascades [sic], [Anna] completed a mental health assessment at Turning Point. [Anna] did not return to Turning Point for any following mental health services as recommended. Currently, [Anna] is not receiving any mental health services or substance abuse treatment. [Anna] has not received suboxone/opiate maintenance treatment since her discharge from Cascades [sic].

15. On April 17, 2017, Durham DSS received a call from Cascade stating that [Anna] was allowed to leave the agency on a pass with an expected return of 8:00 p.m. [Anna] returned to the agency around 1:45 a.m. on April 18, 2017, long after curfew, and appeared intoxicated when she returned. [Anna] admitted that she was drinking alcohol and smoking marijuana after having transportation issues that evening. [Anna] was asked to leave the Cascade program, after this episode. Upon her return, the location of [Alice] was unknown to Cascade staff. [Anna] had left [Alice] with her niece . . . . When DSS later inquired about the whereabouts of [Clarissa], [Anna] informed DSS that [Clarissa] had been removed from the care of [Ms. C.] and returned to the care of [Ms. L.]. [Clarissa] has been in the care of [Ms. L.] since March 30, 2017.

16. On April 18, 2017, Durham County DSS attended a meeting at Cascade at which [Anna] was informed she would be discharged from the program due to failure to meet curfew on April 17, 2017. Cascade stated that they were willing to allow [Anna] the opportunity to remain at Cascade until April 21, 2017 as long as she followed the agency's rules. However, she was discharged from Cascade on April 21, 2017 due to continuously testing positive for illegal substances.

17. On April 18, 2017, Durham DSS completed a

kinship assessment with Ms. [L.], [Anna]'s former foster mother. Due to tensions between [Anna] and [Ms. C.] regarding [Clarissa]'s care, [Anna] requested that both children be placed in the care of [Ms. L.]. [Clarissa] had resided with [Ms. L.] for several months prior to staying with [Ms. C.]. [Anna] has not provided any day-to-day care or financial support for [Clarissa] on a continuous bas[i]s. The kinship home assessment was approved by Durham DSS.

18. On April 19, 2017, Durham DSS conducted a Child and Family Team meeting ("CFT"), which [Anna] attended. [Anna] admitted to Social Worker that she has a history of major trauma as a child. She admits that she has not properly addressed her mental health needs and substance abuse issues. She continues to use illegal substances and abuses alcohol.

19. [Anna]'s illegal substance abuse and lack of mental health treatment substantially impact her ability to parent her children.

20. After departing from Cascade, [Anna] lived for about a month in the Super Eight Motel on Capital Boulevard in Raleigh, and [Alice's father] sometimes stayed with her there. On or about May 17, 2017, she then moved to an ["]extended stay motel" near Wake Forest Road in Raleigh, where she presently resides.

21. Since leaving Cascade, [Anna] worked at UPS for about a week or two. She quit that job because it was "too much" for her. For the most part, [Alice's father] pays for her motel stay.

22. [Anna] has not enrolled in any parenting class. She is not engaged in any mental health treatment or substance abuse treatment program.

23. On May 17, 2017, Durham DSS filed a supplemental petition in this matter and requested

nonsecure custody, as the result of a series of conversations that transpired between [Anna] and DSS staff members on May 16, 2017.

24.    On May 17, 2017, [Anna] tested positive for marijuana and cocaine.  [Alice's father] tested positive for marijuana, cocaine and PCP.  At this court date, [Anna] admitted that she would test positive for marijuana if she was drug tested that same day.

25.    [Anna] called Social Worker Martin.  She indicated that she did not want to be charged with kidnapping, if she took her kids away from [Ms. L.]'s home.  The social worker questioned her as to her plans, and [Anna] indicated that she wanted to go to New Jersey, where she believed she could better access the services needed to sustain recovery.  [Anna] asked the social worker what would be involved in placing the kids with [Alice's father]'s grandmother in New Jersey.  The social worker stated that the grandmother's status as a relative would first have to be confirmed through paternity testing for [Alice's father].  The social worker then informed [Anna] that an ICPC request would have to be sent to New Jersey, so that the local social service agency could investigate the appropriateness of the grandmother's home as a placement for the children.

Respondent challenges, in part, Finding No. 25 to the extent it implies that Anna wanted to move both children to New Jersey.  He contends a social worker testified that Anna intended to take only Alice — and not Clarissa — to stay with relatives in New Jersey.  The trial court's remaining findings are unchallenged and are therefore binding on appeal.  *See Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding

on appeal."). We need not resolve Respondent's challenge to Finding No. 25 because for the reasons set out below, we are satisfied that — even construing Finding No. 25 in the manner advocated by Respondent — the trial court's adjudication of neglect was proper.

Respondent's primary argument is that not only did the trial court fail to make an ultimate finding that Clarissa was at substantial risk of impairment but also that the evidence of record would not have supported such a finding. Because Clarissa's needs were met while living with Ms. L., he contends, Clarissa was not a neglected juvenile.

As this Court has previously stated, "[m]ost cases addressing the definition of neglect arise in the context of termination of parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) . . . ." *In re K.J.D.*, 203 N.C. App. 653, 659, 692 S.E.2d 437, 442 (2010). "The factual situation presented in a termination of parental rights case is normally different from that presented by an adjudication case because in a termination case, the child has usually been removed from the parent's home a substantial period of time before the filing of the petition for termination." *Id.* Conversely, "[a]n adjudication case normally arises immediately following the child's removal from the parent's home." *Id.*

The present appeal from an adjudication of neglect, however, presents the unusual situation where a child had not been living with either of her parents for an

extended period of time prior to the filing of a juvenile petition and was doing well in her voluntary placement with a relative.

> When, as in the present case, the child has been voluntarily removed from the home prior to the filing of the petition, the court should consider evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect. The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the [adjudication] proceeding.

*In re H.L.*, __ N.C. App. __, __, 807 S.E.2d 685, 688 (2017) (internal citation and quotation marks omitted). "Essentially, the trial court must consider the conditions and the fitness of the parent to provide care at the time of the adjudication . . . ." *Id.* at __, 807 S.E.2d at 688 (citation and quotation marks omitted).

We find instructive our decision in *K.J.D.* In that case, the minor child had been living with his maternal grandmother for six months at the time DSS filed an initial petition alleging that his mother had neglected him. The initial petition was dismissed, and DSS filed a second petition nearly a year later. Approximately eighteen months after the child was initially placed with his grandmother, an adjudication hearing was held on the second petition. The trial court determined that even though the child was in a stable placement at the time the second petition was filed, he was nevertheless a neglected juvenile because his mother remained incapable of providing him with proper care and supervision. *K.J.D.*, 203 N.C. App.

at 656, 692 S.E.2d at 441. On appeal, we affirmed the trial court's adjudication of neglect, stating as follows:

> The court's findings of fact show that respondent-mother has been and remains unable to adequately provide for her child's physical and economic needs. She has been unable to correct the conditions which led to the child's kinship placement with the maternal grandmother. She continues to engage in assaultive behavior. She has not completed counseling to address her anger issues or sought treatment for her mental disorder. She does not have stable housing and she does not have a job. The trial court found that respondent-mother had failed "to correct the conditions that led to the removal of the minor child from [her] care for the past 16 to 18 months." The Court also found that "the minor child would be at substantial risk of harm if either of his parents removed the child from [the] placement [with the maternal grandmother.]" We conclude these findings support a conclusion that the child is a neglected juvenile.

*Id.* at 661, 692 S.E.2d at 444.

We recently affirmed the holding of *K.J.D.* in *H.L.* In *H.L.*, the juvenile's parents had problems with domestic violence and substance abuse and entered into a safety plan with DSS to place their daughter with her adult sister. Six months later, DSS filed a juvenile petition alleging that the child was neglected because while she was in her sister's care both parents had submitted drug screens that tested positive for methamphetamines. *H.L.*, __ N.C. App. at __, 807 S.E.2d at 687. The trial court adjudicated the child to be a neglected juvenile and awarded guardianship to the child's sister. *Id.* at __, 807 S.E.2d at 687. This Court followed the framework

set out in *K.J.D.* and held that the trial court's ultimate finding that the child was neglected was supported because "respondent-father and [the child's] mother had failed to remedy the conditions which required [the child] to be placed with her sister in a safety plan, such that they were unable to provide [the child] with proper care." *Id.* at __, 807 S.E.2d at 690.[5]

Here, Clarissa was voluntarily removed from Anna's care and placed with Ms. L. while DSS was in the process of filing its original petition. The trial court's unchallenged findings demonstrate that Clarissa was put in a kinship placement with Ms. L. because of the inability of both of Clarissa's parents to care for her. Respondent was incarcerated, and Anna had issues related to "substance abuse, mental health, unstable housing, prostitution . . . , and inappropriate supervision . . . ."

Although the trial court failed to make an ultimate finding that Clarissa suffered an impairment or was at substantial risk of impairment as a result of Anna's actions, we are satisfied that the evidence here was sufficient to support a finding that Clarissa was at a substantial risk of impairment if she was returned to Anna's care. *See Padgett*, 156 N.C. App. at 648, 577 S.E.2d at 340 ("Where there is no finding

---

[5] In his brief, Respondent cites *In re B.P.*, __ N.C. App. __, 809 S.E.2d 914 (2018), in which this Court reversed an adjudication of neglect as to a child who was in a stable placement at the time DSS filed its neglect petition. However, the mother in *B.P.* had made significant improvements by the date of the adjudication hearing in correcting the conditions that led to the child's removal from her care. *Id.* at __, 809 S.E.2d at 919. The same cannot be said for Clarissa's parents in the present case.

that the juvenile has been impaired or is at substantial risk of impairment, there is no error if all the evidence supports such a finding.").

The trial court's findings make it abundantly clear that the conditions leading to the placement of Clarissa outside of the home had not been corrected. At the time of the adjudication hearing, Respondent was still incarcerated, and Anna had not (1) successfully engaged in substance abuse treatment; (2) enrolled in mental health treatment or parenting classes; or (3) obtained permanent employment. Thus, we conclude that the evidence supported the adjudication of Clarissa as a neglected juvenile under N.C. Gen. Stat. § 7B-101(15).

## Conclusion

For the reasons stated above, we affirm the trial court's 21 September and 2 October 2017 orders.[6]

AFFIRMED.

Judges DILLON and INMAN concur.

---

[6] Although Respondent's notice of appeal indicated that he was also challenging the trial court's Disposition Order, his appellate brief does not contain any argument as to the validity of that order.