DAVIS, Judge.
Z.W. ("Respondent") appeals from the trial court's orders adjudicating her children to be neglected and dependent juveniles and continuing their placement in the custody of the Guilford County Department of Health and Human Services ("DHHS"). After a thorough review of the record and applicable law, we reverse.
Factual and Procedural Background
Respondent has three children: "Matthew,"[1] "Lauren," and "Thomas."[2] Matthew was born in December 2004, and Lauren was born in July 2010. Thomas was born in March 2016.
Prior to DHHS's current involvement with the family, Matthew and Lauren lived exclusively with Respondent. Beginning in 2005, the family became the subject of multiple child protective services ("CPS") reports in Forsyth, Mecklenburg, and Guilford Counties. Although the family had received and been recommended for services to address concerns of neglect and mental health issues, Lauren and Matthew remained in Respondent's custody.
In March 2016, Lauren and Matthew were staying with a family friend ("Ms. F.") while Respondent was giving birth to Thomas at Women's Hospital in Greensboro, North Carolina. Thomas was briefly placed in the neonatal intensive care unit ("NICU") based on his unstable temperature and difficulty in feeding.
The day after Thomas was born, DHHS received a CPS report that Respondent was behaving in a paranoid, oppositional, and "closed and guarded" manner toward hospital staff.[3] After accusing the staff of trying to poison her with medication and stating that she wanted Thomas transferred to Brenner Children's Hospital, Respondent refused to sign the transfer paperwork or discuss a plan for his impending discharge. Observing the behavior of Respondent, who refused to be evaluated, a hospital psychiatrist diagnosed her with "Acute Psychogenic Paranoid Psychosis." Staff also reported that Respondent had to be redirected while visiting Thomas in NICU when she attempted to undress the baby and to give him water.
Sara Fitzgerald, a DHHS social worker, visited Respondent at the hospital on Friday, 25 March 2016. Respondent initially refused to discuss the CPS report or Thomas' discharge plan, citing the fact that it was Good Friday, and asked Ms. Fitzgerald to come back the next day. Respondent later agreed by email to discuss matters after she was released from the hospital that afternoon. Attempting to locate Lauren and Matthew, Ms. Fitzgerald was able to reach Ms. F., who confirmed that Lauren and Matthew were with her. Ms. Fitzgerald spoke to Respondent by phone at 4:45 p.m. after Respondent had left the hospital. Respondent denied the allegations in the CPS report and refused to meet with Ms. Fitzgerald until the following Monday morning. Ms. Fitzgerald advised Respondent that DHHS would file a petition and take her children into non-secure custody if she did not have a plan in place before Thomas' discharge, which was scheduled for 10:00 a.m. on Saturday, 26 March 2016.
On the evening of 25 March 2016, Ms. Fitzgerald received a phone call from Ms. M., a friend of Respondent. Ms. M. reported that Respondent, Lauren, and Matthew were at Respondent's home and that Respondent had called the police because she believed that DHHS was intending to take away her children. When Ms. Fitzgerald went to Respondent's home, she found Greensboro police officers there along with Respondent and Ms. M. Ms. Fitzgerald explained her concerns about Respondent's behavior in the hospital and her lack of cooperation with DHHS. Respondent insisted she had done nothing wrong and was fully capable of caring for her children. She eventually agreed to place the children with Ms. M. until a Team Decision Meeting ("TDM") could be convened on Monday, 28 March 2016.
Thomas was released from the hospital to Respondent on Saturday, 26 March 2016. Ms. M. accompanied Respondent to the hospital, and they agreed to a safety plan forbidding Respondent from having unsupervised contact with her children.
Respondent attended the TDM on 28 March 2016 with another family friend, Ms. R. Respondent was not forthcoming about her mental health history and denied the existence of any current issues. However, she agreed to voluntary placements for Lauren and Matthew with Ms. R. and to have Thomas remain in the care of Ms. M. She further agreed not to have unsupervised contact with the children and to obtain a mental health evaluation as soon as possible.
At the conclusion of the meeting, Respondent began to raise objections to the process, beginning with the initial safety assessment performed at the hospital on 25 March 2016. She remained seated in her chair for several minutes while continuously laughing before eventually agreeing to leave the room. In the days following the TDM, Ms. Fitzgerald asked Respondent about the status of her mental health evaluation only to be told that it was "in progress."
On the night of 12 April 2016, Respondent came to Ms. R.'s residence unannounced. She accused Ms. R. of plotting to take her children from her and instructed Lauren and Matthew to pack their belongings. Respondent contacted the police in order to remove the children from the residence. The police officers notified the on-call social worker at DHHS of Respondent's call, and the social worker responded to the residence. The social worker informed Respondent that she could not take the children and that a TDM would need to be held before Lauren and Matthew could be removed from Ms. R.'s residence. The children remained with Ms. R. overnight.
The following morning, Ms. R. notified Ms. Fitzgerald that she was no longer willing to keep the children due to Respondent's erratic behavior. Ms. Fitzgerald attempted to call Respondent to address the previous night's events and arrange an emergency TDM. Respondent returned her call at 10:09 a.m. Ms. Fitzgerald requested that Respondent attend an emergency TDM at 11:00 a.m., and Respondent stated that she was "handling business" at the time and that her attorney would contact Ms. Fitzgerald about a meeting. Respondent then hung up the phone.
DHHS's subsequent attempts to email Respondent were unsuccessful. As a result, DHHS obtained 12-hour custody of Lauren, Matthew, and Thomas. Ms. Fitzgerald informed Respondent that her children had been taken into DHHS custody. In response to learning this information, Respondent said that she had an aunt in West Virginia who could take care of the children. When Ms. Fitzgerald asked if she was prepared to attend an emergency TDM, Respondent replied that she wanted to go to court and asked for her court date before hanging up the phone.
On 14 April 2016, DHHS filed juvenile petitions alleging the children were neglected and dependent as defined by N.C. Gen Stat. § 7B-101(9), (15). That same day, an initial non-secure custody hearing was held, and the trial court appointed a guardian ad litem ("GAL") for Respondent pursuant to Rule 17 of the North Carolina Rules of Civil Procedure"based on [Respondent's] extensive mental health history and behavior since the birth of [Thomas]."
An adjudication hearing was held before the Honorable Randle Jones in Guilford County District Court on 10 October 2016. On 29 November 2016, the trial court entered an order adjudicating the children to be neglected and dependent.
On 22 March 2017, a dispositional hearing was held before the Honorable H. Thomas Jarrell, Jr. At the beginning of the hearing, the trial court allowed Respondent's motion to release her GAL, citing the results of a multidisciplinary evaluation performed on 21 February 2017 that found her to be a "competent adult" and "capable of providing a proper home for her children." The trial court entered a dispositional order on 25 April 2017, continuing the children in DHHS custody and ordering Respondent to obtain a psychiatric evaluation as recommended by a parenting/psychological assessment that was completed on 3 June 2016. Respondent gave notice of appeal from both orders.
Analysis
On appeal, Respondent challenges the trial court's adjudications of Matthew, Lauren, and Thomas to be dependent and neglected juveniles. We review adjudications under N.C. Gen. Stat. § 7B-807 (2017) to determine whether the trial court's findings of fact are supported by "clear and convincing competent evidence" and whether the court's findings, in turn, support its conclusions of law. In re Helms , 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citations omitted). Findings of fact that are supported by competent evidence, or that are unchallenged by the appellant, are "binding on appeal." In re McCabe , 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003) (citation omitted). Moreover, erroneous findings do not constitute grounds for reversal if the court's adjudication is supported by the remaining findings. In re T.M. , 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006). "The conclusion that a juvenile is abused, neglected, or dependent is reviewed de novo ." In re V.B. , 239 N.C. App. 340, 341, 768 S.E.2d 867, 868 (2015).
I. Findings of Fact
Respondent challenges two of the trial court's findings of fact in the adjudication order. We address her arguments in turn.
A. Finding No. 24
Respondent first argues that competent evidence does not support portions of Finding No. 24 in the trial court's adjudication order, which states as follows:
24. On April 13, 2016, Social Worker Fitzgerald received a telephone call from [Respondent's] Obstetrics Care Manager, Kim Briggs. Ms. Briggs reported that she attended a medical appointment for [Thomas] with the kinship placement caregiver on April 12, 2016. Ms. Briggs advised that [Respondent] was scheduled to attend that appointment; however, she did not attend. Ms. Briggs reported that [Respondent] contacted her via telephone during that appointment, and was upset with her because a referral was completed to the Care Coordination for Children Program (CC4C) for the juvenile, [Thomas], and [Respondent] did not authorize that referral. At that time, [Respondent] became angry and was unwilling to have a rational conversation with Ms. Briggs. Ms. Briggs expressed her concerns regarding [Respondent's] mental health and feels that [she] needs to be hospitalized due to her mental health issues. Ms. Briggs also expressed her concerns for the safety of the juveniles, due to mother displaying such unstable and erratic behaviors.
Respondent contends the majority of this finding "is based on the allegation in the petition[s,] rather than on competent evidence" presented at the adjudicatory hearing.
DHHS concedes that the majority of Finding No. 24 is unsupported by the evidence and that the only competent evidence that supports Finding No. 24 is the following testimony from Ms. Fitzgerald:
[MS. FITZGERALD:] ... I had received a voicemail message that morning also that there was an interaction between [Respondent] and the OB care manager in which she was behaving irrationally. And I received a voicemail-this was a couple of days prior I believe, but I received a voice mail [sic] saying that her care manager was very concerned because she was acting erratically and unstable, and that the care manager had concerns about the safety of the children.
We agree that the only competent evidence supporting Finding No. 24 is that Respondent's obstetric care manager left Ms. Fitzgerald a voicemail detailing Respondent's "unstable and erratic behaviors." Thus, we disregard the unsupported averments in Finding No. 24 for purposes of reviewing the court's conclusions of law. See In re J.R. , 243 N.C. App. 309, 312, 778 S.E.2d 441, 444 (2015) (disregarding unsupported findings for purposes of appellate review of trial court's conclusions of law).
B. Finding No. 28
Respondent also argues that competent evidence did not support Finding No. 28 in the trial court's adjudication order, which lists chronologically the CPS reports made about her family to social service agencies in Guilford, Forsyth, and Mecklenburg Counties between January 2005 through August 2015. She again contends the court merely copied the allegations of petitions filed by DHHS. We disagree.
During her testimony, Ms. Fitzgerald attested to the accuracy of the petitions' allegations with regard to Respondent's CPS history.[4] This testimony served as competent evidence to support the trial court's findings of fact. Accordingly, we overrule this exception.
II. Conclusions of Law
A. Adjudication of Dependency
Respondent next claims that the evidence and the trial court's findings of fact do not support its adjudication of dependency. We agree.
A "dependent juvenile" is defined, in pertinent part, as one whose "parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2017). In order to sustain an adjudication of dependency, "the trial court must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements." In re P.M. , 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005). "Findings of fact addressing both prongs must be made before a juvenile may be adjudicated as dependent, and the court's failure to make these findings will result in reversal of the court." In re B.M. , 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007).
The findings contained in the trial court's adjudication order do not address either prong of dependency as required by our case law. The order first states the factual history of the case and then makes a conclusory "finding" that Respondent's children "are dependent and neglected as defined by N.C.G.S. § 7B-101(9) and (15)." The order repeats this statement as a conclusion of law and further states that the children "require more adequate care and supervision than any parent can provide at this time."
However, the order contains no finding of fact establishing that Respondent was incapable of providing proper care and supervision for her children or that she lacked an appropriate alternative placement for them at the time the petitions were filed on 14 April 2016. See B.M. , 183 N.C. App. at 90, 643 S.E.2d at 648.
Furthermore, the remaining evidence introduced at the adjudicatory hearing does not support an adjudication of dependency. While DHHS demonstrated it had legitimate grounds for concern about Respondent's mental health following the birth of her son, no evidence was presented to support the conclusion that Respondent's mental health rendered her incapable of caring for her children. Although Respondent's behavior at the hospital was erratic and potentially worrisome, the trial court's findings do not support the conclusion that her conduct posed an actual risk to Thomas, Lauren, or Matthew.
The evidence further demonstrated that Respondent arranged for Ms. F. to care for Lauren and Matthew while she was hospitalized and subsequently agreed to appropriate placements for all three children with her friends, Ms. M. and Ms. R. Although Ms. R. was no longer willing to care for Lauren and Matthew after Respondent came to her house with the police on 13 April 2016, DHHS presented no evidence that Ms. M. remained unwilling to serve as a placement for the children or was otherwise inappropriate.
DHHS cites In re K.W. , 192 N.C. App. 646, 666 S.E.2d 490 (2008), in support of its contention that Respondent's violation of her safety plan by attempting to disrupt Lauren and Matthew's placement was sufficient to support an adjudication of dependency. In In re K.W. , the respondents-parents violated a Safety Assessment Plan when the mother allowed the father to move back into the home one week after thirteen-year-old K.W. disclosed that he had repeatedly raped her during the preceding twelve months. Id. at 647-48, 666 S.E.2d at 492. In affirming the adjudication of dependency, we explained:
The trial court found that K.W. was dependent because her parents refused to adhere to the Safety Plan put in place by YFS. This conclusion was supported by K.W.'s testimony that [her father] agreed to cease all contact with K.W. in the Safety Plan, but moved back into the home about one week later....
There was no error in the court's decision. K.W. was in an injurious environment where her father continued to be present despite his agreement to stay away. K.W.'s mother was not seeking to enforce the Safety Plan, and therefore, YFS found it necessary to obtain a Non-Secure Custody Order to protect the child.
Based on the facts presented, there was clear and convincing evidence for the trial court to find K.W. abused, neglected and dependent.
Id . at 656, 666 S.E.2d at 497.
However, In re K.W. does not stand for the principle that any violation of a voluntary safety plan by a parent renders the affected child dependent per se . Thus, absent evidence that Respondent's violation of her voluntary safety plan left the children without an appropriate caregiver-including Respondent-we are unable to conclude that the evidence and the findings of fact supported the trial court's conclusion that the children were dependent juveniles as defined by N.C. Gen. Stat. § 7B-101(9). Accordingly, we reverse the trial court's adjudication of dependency.
B. Adjudication of Neglect
Respondent next challenges the trial court's adjudication of neglect as unsupported by the evidence and the court's findings of fact. Once again, we agree.
A "neglected juvenile" is defined, inter alia , as one "who does not receive proper care, supervision, or discipline from the juvenile's parent ... or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2017). The juvenile must experience "some type of physical, mental, or emotional impairment or a substantial risk of such impairment" in order to be deemed neglected. In re C.M. , 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (citation omitted).
Generally, the trial court's inquiry at adjudication is whether the child was neglected at the time the juvenile petition was filed rather than at the time of the hearing. In re A.B. , 179 N.C. App. 605, 611, 635 S.E.2d 11, 15 (2006). However, a newborn "child may be adjudicated as neglected by a parent even if the child has never resided in the parent's home." In re K.J.D. , 203 N.C. App. 653, 661, 692 S.E.2d 437, 443 (2010). Under such circumstances, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." Id . at 661, 692 S.E.2d at 443-44 (citation and quotation marks omitted). A similar standard applies when a child has been voluntarily placed outside of the parent's home for a significant period at the time the petition is filed. See id. at 660-61, 692 S.E.2d at 443-44.
Here, the trial court's adjudication that the children were neglected was unsupported by ultimate findings that Matthew, Lauren, and Thomas were either (1) denied proper care, supervision, or discipline; or (2) were living in an injurious environment. See In re T.M.M. , 167 N.C. App. 801, 803, 606 S.E.2d 416, 417-18 (2005) (concluding that "the order in this case ... does not reference any of the several statutory grounds for determining neglect"). The order is further devoid of any finding that the children either experienced a "physical, mental, or emotional impairment or a substantial risk of such impairment," C.M. , 183 N.C. App. at 210, 644 S.E.2d at 592, or would face a substantial risk of such neglect if returned to Respondent's care, K.J.D. , 203 N.C. App. at 661, 692 S.E.2d at 443 ; see In re Gleisner , 141 N.C. App. 475, 481, 539 S.E.2d 362, 366 (2000).
Furthermore, we cannot say that the omission of these findings constitutes harmless error because the evidence presented by DHHS likewise fails to support a finding of neglect. DHHS presented no evidence that Lauren or Matthew were actually harmed or faced a substantial risk of harm while in Respondent's care. Additionally, there was no evidence presented that Lauren, Matthew, or Thomas faced a substantial risk of future neglect in Respondent's care. See In re E.P., M.P. , 183 N.C. App. 301, 307, 645 S.E.2d 772, 775-76 (affirming dismissal of juvenile petition alleging neglect where "DSS failed to present clear and convincing evidence that the parents' problems created a substantial risk of harm to the children"), aff'd per curiam , 362 N.C. 82, 653 S.E.2d 143 (2007).
DHHS contends that a parent's lack of cooperation with social services can support an adjudication of neglect. However, in such cases our court has required findings that the minor child had been exposed to improper care or an injurious environment in order to conclude that the parent's refusal to cooperate posed a substantial risk of harm to the children. See In re T.R.T. , 225 N.C. App. 567, 571-72, 737 S.E.2d 823, 827 (2013) (minor child was unable to wake respondent-mother and left apartment to seek food and assistance from neighbor); In re T.S. , 178 N.C. App. 110, 113-14, 631 S.E.2d 19, 22 (2006) (respondent-mother abused illegal substances, subjected children to domestic violence, threatened a social worker in front of the children, and possessed firearm in home despite felony conviction), aff'd per curiam , 361 N.C. 231, 641 S.E.2d 302 (2007).
Here, there is no such evidence tending to show that the minor children were improperly cared for or placed in an injurious environment. Moreover, although Respondent has a history with CPS, there is no evidence that the children were previously removed from her custody or subject to an adjudication under N.C. Gen. Stat. § 7B-807. Cf. C.M. , 183 N.C. App. at 209, 644 S.E.2d at 591 (affirming adjudication of neglect where (1) the parents failed to comply with mental health services required by their case plan and (2) C.M.'s sibling had previously been adjudicated neglected, leading to the termination of the parents' rights regarding the sibling based on similar issues).
We recognize that a legitimate basis existed for DHHS's involvement in this case. The CPS report received on 24 March 2016 and Respondent's behavior in the hospital and following her discharge were clearly sufficient to "trigger[ ] the investigative mandate of N.C.G.S. § 7B-302...." In re Stumbo , 357 N.C. 279, 288, 582 S.E.2d 255, 261 (2003). Nevertheless, given the absence of evidence of harm or a substantial risk of harm to Thomas, Lauren, and Matthew, we hold that Respondent's possible mental illness and general lack of cooperation with DHHS alone could not support an adjudication of neglect. Accordingly, we reverse the trial court's adjudication of neglect.[5]
Conclusion
For the reasons stated above, we reverse the trial court's 29 November 2016 and 25 April 2017 orders.
REVERSED.
Report per Rule 30(e).
Judges CALABRIA and TYSON concur.

Pseudonyms and initials are used throughout this opinion for the privacy of the minor children and for ease of reading.

Matthew's father is not a party to this appeal. The fathers of Lauren and Thomas are unknown.

It was also reported that Respondent and Thomas tested positive for barbiturates but that Respondent had a prescription for these medications. It was further "reported that [Respondent] has been diagnosed with schizophrenia," but no evidence of such a diagnosis appears in the record.

At the hearing, Respondent objected on hearsay grounds to Ms. Fitzgerald's testimony about the nature and outcome of the prior CPS reports, insofar as the information was obtained from other counties' agency records or personnel. Because she has not raised this issue on appeal, we do not address it.

In light of our ruling, we need not consider Respondent's remaining argument on appeal challenging the trial court's failure to authorize unsupervised visitation with the children.