IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 19-476

Filed: 21 July 2020

New Hanover County, Nos. 18-JA-153, 154

IN THE MATTERS OF: S.M.L., E.R.M.L, Minor Children

Appeal by respondent from order entered 4 March 2019 by Judge J. H. Corpening, II in District Court, New Hanover County. Heard in the Court of Appeals 18 February 2020.

> *New Hanover County Department of Social Services, by Jill R. Cairo, for petitioner-appellee.*
>
> *Miller and Audino, LLP, by Jeffrey L. Miller, for appellant-mother.*
>
> *Administrative Office of the Courts, by Michelle FormyDuval Lynch, for appellee-guardian ad litem.*

STROUD, Judge.

This appeal arises out of an Order on Adjudication of neglect and Initial Disposition. Because there were not sufficient findings of fact to support the trial court's conclusion of neglect as to one of the juveniles, Ed,[1] we reverse the adjudication as to Ed and remand for further findings. The trial court's findings of fact as to the other juvenile, Sara, support its conclusion of law regarding her adjudication as neglected. However, the trial court failed to comply with the

---

[1] Pseudonyms are used to protect the identity of the juveniles.

requirements of North Carolina General Statute § 7B-911 in terminating jurisdiction of the juvenile court and transferring the case as a Chapter 50 matter because the trial court failed to make findings of fact and conclusions of law regarding modification of the existing Chapter 50 custody order and finding no need for continued intervention by the juvenile court. In addition, the trial court failed to enter a Chapter 50 order as directed in its rendition and mandated by the Adjudication and Disposition order on appeal, so we must remand for entry of the Chapter 50 order in accord with North Carolina General Statute § 7B-911. Accordingly, with respect to Sara, we affirm in part, reverse in part, and remand for further proceedings.

## I. Background

Mother and Father were married in 2009 and separated in 2014. They are the parents of Sara, born in 2008, and Ed, born in 2013. On 14 June 2016, Father initiated a civil action under Chapter 50 against Mother seeking child custody. On 13 October 2016, the trial court entered a temporary child custody order granting Mother primary physical custody of the two children. The trial court granted Father visitation and required him to pay child support. On 17 March 2017, the trial court entered a Consent Judgment and Order adopting the custody terms of the October 2016 temporary order with minor changes and adjudged Father in contempt for

nonpayment of child support. The Consent Order regarding custody was still in effect when the petition was filed in this action.

Since the trial court's findings of fact are mostly unchallenged, we will quote the portions of the facts pertinent to the issues on appeal as found by the trial court. Finding of Fact 2 was based upon a written stipulation by the parties, while the remaining findings were made by the trial court and were not stipulated:

> [2.] a. On or about March 2018, the Juvenile, [Sara], disclosed to Respondent-Mother that she was being sexually abused by [Joe], a man who had resided with the family for several years prior to the disclosure.[2]
>
> b. The Respondent-Mother immediately took [Sara] to the hospital and reported the allegations to medical and law enforcement officials.
>
> c. [Sara] was treated by medical professionals and made available to law enforcement.
>
> d. [Sara] had a CME (Child Medical Examination) at the Carousel Center on March 9, 2018, during which she again made consistent disclosures regarding the sexual abuse. During her interview, [Sara] was also able to illustrate her disclosure by drawing a penis with "white stuff coming out of it."
>
> e. [Joe] has not been charged with any criminal conduct.
>
> f. Respondent-Mother has had a difficult time adjusting to the fact that her significant other was responsible for sexually assaulting her daughter. However, for purposes of this action, the parties stipulate and agree that [Sara] was sexually assaulted by [Joe], on or before February 2018,

[2] We have used a pseudonym for Mother's boyfriend who sexually abused Sara, to protect the identity of the minor children.

and any allegations she has made to law enforcement or medical professionals regarding her assault shall be deemed admissible and credible at the trial of this matter.

3. At the time [Sara] disclosed the sexual abuse to Respondent-Mother, and before taking her to seek medical attention, Respondent-Mother drove [Sara] to [Joe]'s place of employment to confront him about the allegations.

4. In her CME on March 9, 2018, [Sara] disclosed that on more than one occasion, [Joe] had her touch his genitals with her hand and also touched her genitals with his hand. This touching was skin-to-skin contact, but [Sara] denied that there was vaginal or anal penetration.

5. [Sara] disclosed that the sexual abuse would usually happen at night, at times when her mother was not present in the residence.

6. A. copy of the CME Report for [Sara] for March 9, 2018 was admitted into evidence without objection and pursuant to the stipulation of the parties and is incorporated by reference as if fully set forth herein.

7. [Sara] disclosed to Helen DePuy, Family Preservation and Reunification Specialist with Methodist Home for Children, that the sexual abuse began when she was six years old. She described that it was very confusing to her, because [Joe] would be nice to her otherwise.

8. Neither Respondent-Parent was aware of the sexual abuse of [Sara] by [Joe] prior to [Sara] making the disclosure in March 2018.

9. From March 29, 2018 to April 5, 2018, both Juveniles were placed with the Respondent-Father. They were allowed to move back to Respondent-Mother's residence upon assurance that the Juveniles would have no contact with [Joe].

10. Respondent-Mother and the Juveniles remained in the same residence throughout the CPS investigation. This residence is owned by [Joe]'s brother and was being rented jointly by Respondent-Mother and [Joe].

11. As the Child Protective Services (CPS) investigation continued, Respondent-Mother continued to have contact with [Joe]. As of May 30, 2018, Respondent-Mother reported that she still talked to [Joe] because she was worried about him as he had been sleeping in his car and has a seizure disorder. At that time, she denied that he had been to her home or had contact with the Juveniles.

12. Both [Sara] and Respondent-Mother were referred for therapy services. In her sessions, Respondent-Mother continued to express doubt about the sexual abuse allegations, often actively seeking to discredit [Sara] and the details of her account.

13. The family was referred to Helen DePuy, a Family Preservation and Reunification Specialist with Methodist Home for Children. The first session was held on June 5, 2018. The goals of this intervention were to support [Sara] and help Respondent-Mother come to terms with what had happened. The plan for services included in-home family sessions twice per week and individual sessions for Respondent-Mother as well as joint sessions with one or both Juveniles for a six- to eight-week period. [Sara] was ultimately transitioned into Cognitive Behavioral Therapy which lasted until November 2018.

14. Ms. DePuy provided counseling and psychosocial education to Respondent-Mother to educate her regarding various aspects of sexual abuse, including the disclosure process of sexual assault victims as Respondent-Mother continued to question why, if the allegations were true, [Sara] waited so long to disclose. Respondent-Mother expressed the belief that [Sara] was manipulating the family to "get rid of" [Joe] in hopes that the Respondent-Parents would reunite. Respondent-Mother compared her

own sexual activities with [Joe] to [Sara]'s account in attempting to discredit the allegations. Respondent-Mother stated that [Joe] was the first man who made her happy and was not abusive or aggressive towards her, asserting that she has "a right to be happy." Respondent-Mother was confronted about having put pictures of herself and [Joe] back on the walls in the residence where she and the Juveniles continued to reside; she responded that those were her happy times, and she did not want to not have them up because of the happy memories they represented, evidencing a complete lack of insight as to how this would affect [Sara]. Respondent-Mother expressed that she felt it was unfair to ask her to take the pictures down, but agreed to do so, only if she could place them on her bedside table. In counseling with [Sara], the Juvenile was very upset about these pictures continuing to be displayed in the household, saying that nobody believed her (about the allegations) and that her mother did not care.

15. On June 14, 2018, police responded to Respondent-Mother's home to do a welfare check of the Juveniles at the request of Respondent-Father who was standing by down [sic] the street with law enforcement. Misti Campbell, Social Worker with the Department, was summoned to the scene at approximately 10:30 p.m.

16. Upon her arrival, Social Worker Campbell learned that law enforcement had located [Joe] inside the home and asked him to leave. Respondent-Mother had initially denied that he was present within the residence, but he was discovered in her bedroom playing video games when law enforcement searched the premises with Respondent-Mother's consent.

17. Social Worker Campbell attempted to interview Respondent-Mother on scene, but Respondent-Mother refused to answer questions as to when [Joe] had arrived at the residence. When confronted by Social Worker Campbell about the prohibition of [Joe] being present in the residence, Respondent-Mother refused to directly

answer the questions, but stated "but he isn't around the kids" and went on to say that she did not feel the allegations of sexual abuse were true. At no time did Respondent-Mother claim that [Joe] had broken into her residence,[3] that she did not know he was in the residence, or that she was surprised law enforcement found him there; she made no inquiry about pressing criminal charges against [Joe] related to him being in the home that night or at any other time.

18. Social Worker Campbell advised that the Juveniles were being removed from the home to go stay with Respondent-Father as a result of [Joe] being found in the residence and asked Respondent-Mother to wake them and gather their belongings. Respondent-Mother agreed but punched the front windows of the home as she went inside. She woke the Juveniles up but did not gather any of their belongings and sent them outside without shoes on. The Juveniles were initially upset and crying but as soon as they saw Respondent-Father, they immediately stopped crying and were fine.

19. Social Worker Campbell again attempted to interview Respondent-Mother and complete a Safety Assessment . . . but Respondent-Mother refused.[4]

20. Social Worker Lindsay Hayden followed up with Respondent-Mother on June 18, 2018 about [Joe] having been found in her residence. During that interview, Respondent-Mother said that [Joe] had since left for California, as him leaving was the only thing that would separate their love for one another. Social Worker Hayden questioned Respondent-Mother as to why the sexual abuse allegations had not been sufficient reason to separate from him, and Respondent Mother replied that "the details don't add up" referring to [Sara]'s disclosure. When specifically

---

[3] Respondent Mother later made some of these claims to her counselor and others in her testimony at the hearing.

[4] We have omitted the portion of this finding not supported by the record, as discussed below.

discussing [Joe] being found inside the residence days earlier, Respondent-Mother indicated that he would come over and stay in the bedroom on the opposite side of the residence from the children's bedrooms, saying she could lock the hallway door that led to that bedroom. Respondent-Mother again stated that [Joe] was now in California, but that if he could not get a job, he would go to Kentucky where he was originally from. Respondent-Mother questioned Social Worker Hayden about the ramifications for the CPS case if she were to marry [Joe].

21. Contrary to what Respondent-Mother said to Social Worker Hayden, she told Helen DePuy in a subsequent counseling session that [Joe] had been coming into her home without her knowledge, saying she did not know he was there because she sleeps on the couch in her work clothes so she did not have any reason to go back to the bedroom. Ms. DePuy was "very, very" concerned that [Joe] had been located back in the residence, particularly when the Juveniles were present.

22. [Sara] related to Ms. DePuy her belief that [Joe] had been coming to her mother's residence regularly prior to the June 14, 2018 incident.

23. In subsequent counseling sessions, Respondent-Mother wavered between disbelief of [Sara]'s account of the sexual abuse, believing that "something" happened to [Sara] without acknowledging [Joe]'s culpability, and saying that she does believe [Sara]. At times, she complains of [Sara] not listening or being disrespectful towards her but seems unable to comprehend that this could be symptomatic of her having been sexually abused, particularly in conjunction with Respondent-Mother's stated disbelief of the allegations. Ms. DePuy stated that Respondent-Mother's disbelief impeded [Sara]'s recovery; [Sara]'s "trauma narrative" she wrote as part of her Cognitive Behavioral Therapy included references to Respondent-Mother's disbelief.

24. By contrast, Ms. DePuy observed Respondent-Father to be fully and appropriately supportive of [Sara]'s therapy. He was always present, not missing a single session, verbalized his belief in [Sara]'s account and made her feel safe and protected.

25. Subsequent to the June 14, 2018 incident and the June 18, 2018 follow up interview with Social Worker Hayden, Respondent-Mother continued to remain in contact with [Joe], such that she reported that he had gone from California to Kentucky. In early July 2018, Social Worker Hayden had local law enforcement confirm that [Joe] was staying at his father's residence in Covington, Kentucky.

26. By July 23, 2018, Social Worker Hayden learned that [Joe] had returned to Wilmington and was able to make telephone contact through his employer, Booth Brothers.

27. When confronted on July 24, 2018, about [Joe] being back in Wilmington, Respondent-Mother acknowledged that she already knew he was back in town and was aware of where he was staying and working. During this conversation, Respondent-Mother again questioned the lack of physical evidence to substantiate the sexual abuse allegations and would only say "something happened to [Sara]." When Social Worker Hayden pressed her to acknowledge that "[Joe] did something to [Sara]," Respondent-Mother only repeated "something happened to [Sara]." When Social Worker Hayden asked Respondent-Mother point blank whether she believed [Sara], she again stated only that "something happened to [Sara]."

28. On August 10, 2018, during a walk-through inspection of Respondent-Mother's residence, Social Worker Hayden observed a dresser in the hallway outside of the master bedroom that was full of [Joe]'s clothing as well as drug paraphernalia and other items that Respondent-Mother indicated belonged to [Joe].

After the New Hanover County Department of Social Services ("DSS") and Father discovered Joe was continuing to come to Mother's residence in June and July, DSS recommended that Father file a motion in the existing Chapter 50 custody case seeking modification of custody. "On or about July 30, 2018, Respondent-Father attempted to modify the existing custody order, which had granted primary physical custody of both Juveniles to Respondent-Mother, but his motion for *ex parte* relief was denied when the Court realized the Department of Social Services was involved." Thus, on 13 August 2018, DSS filed the petition alleging the juveniles were neglected.

The trial court also made the following findings and conclusions relevant to the issues on appeal:

> 29. It is relevant to the Court's determination that the Juvenile, [Ed], when residing with Respondent-Mother, lived in a home where another child was abused and/or neglected by a person who regularly lived in the home.
>
> 30. The Juveniles . . . are neglected Juveniles as that term is defined by N.C.G.S. § 7B-101(15), in that they do not receive proper care, supervision or discipline from the Respondent-Mother and lived in an environment injurious to their welfare, as detailed in Findings of Fact 2 through 29 above.
>
> 31. [Sara] has remained in placement with Respondent-Father since June 14, 2018, and [Ed] has been placed with him since August 13, 2018. Respondent-Father has followed all recommendations of the Department as to the Juveniles' care, and no concerns are noted.
>
> . . . .

33. Helen DePuy discharged [Sara] from therapeutic services on November 8, 2018, with no recommendation for ongoing services. Ms. DePuy did counsel Respondent-Father on possible symptoms that could arise in the future.

34. [Ed] is in daycare and is a healthy, happy five-year-old. He is up-to-date on well-child checks with no ongoing health concerns. He is being considered for a referral to speech therapy services.

35. Respondent-Mother has been visiting with both Juveniles. She insisted on having visits with [Sara] despite the same not being therapeutically recommended previously by Ms. DePuy. During the visits, Respondent-Mother struggles to respond appropriately to [Sara], becoming defensive when [Sara] attempts to address issues with her. Respondent-Mother is able to interact well with [Ed] during visits, drawing or playing together with him.

36. Respondent-Mother has refused to sign releases for the Department or the Guardian ad Litem such that no information is available as to her compliance or lack thereof with recommended services nor did Respondent-Mother present direct evidence as to her compliance.

An Order for Nonsecure Custody was entered on 13 August 2018 granting DSS custody and placement authority. The trial court held a hearing regarding adjudication and disposition on 28 November and 6 December 2018. On 4 March 2019, the court entered an Order on Adjudication and Initial Disposition. Both juveniles were adjudicated to be neglected, and the Father was granted legal custody of the children. The trial court also ordered as follows:

6. Attorney Jennings shall prepare an Order reflective of the findings, conclusions and decretal set forth therein, and the same shall be filed in the existing Chapter 50 custody

> action between Respondent-Parents, to wit, New Hanover
> County Case Number 16 CVD 1965. All further hearings
> as may be necessary shall be conducted under that case file
> and shall occur in regular civil district court.

No order regarding the Chapter 50 action as directed by the trial court appears in our record, and according to the briefs, this order was never entered.[5] Mother timely appealed the Adjudication Judgment and Disposition Order.

## II.    Standard of Review

"The role of this Court in reviewing a trial court's adjudication of neglect and abuse is to determine '(1) whether the findings of fact are supported by "clear and convincing evidence," and (2) whether the legal conclusions are supported by the findings of fact[.]'" *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007) (alteration in original) (quoting *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000)), *aff'd as modified*, 362 N.C. 446, 665 S.E.2d 54 (2008). "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *Id.* (citing *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003)).

> In order for a child to be properly adjudicated as
> neglected, "this Court has consistently required that there
> be some physical, mental or emotional impairment of the
> juvenile or a substantial risk of such impairment as a
> consequence of the failure to provide proper care,
> supervision, or discipline." "Whether a child is neglected is

---

[5] We have no information as to why this order was not entered.

a conclusion of law which must be supported by adequate findings of fact."

*In re R.L.G.*, 260 N.C. App. 70, 75, 816 S.E.2d 914, 918 (2018) (citation omitted).

## III. Findings of Fact

We first note that Mother's argument regarding the trial court's conclusion of law as to neglect mentions several findings of fact she claims are not supported by the evidence, although she did not make a separate argument regarding the findings of fact she claims were not supported by the evidence. As to the few findings challenged within her other arguments, her primary contention is regarding the wording of the finding more than its substance or a specific detail within the finding. But since conclusions of law must be supported by findings of fact, we will first address Mother's challenges to the findings of fact. *See Rittelmeyer v. Univ. of North Carolina at Chapel Hill*, 252 N.C. App. 340, 348-49, 799 S.E.2d 378, 384 (2017) ("Since findings of fact are required to support conclusions of law, if the findings of fact were not supported by substantial evidence, it would have been helpful for petitioner to challenge those facts *before* addressing alleged errors of law. After all, if material facts in the findings were not supported by the evidence, we might never need to reach at least some of the arguments regarding errors of law." (citations omitted)).

Mother's most detailed argument mentions Finding No. 19. She contends that Finding of Fact 19 is not supported by "any evidence that Social Worker Campbell attempted to interview Mother, or to complete a safety assessment,

*once the juveniles left the scene*, or that Mother refused such an assessment or interview, on 14 June 2018." Mother's argument is that the Social Worker did not attempt to interview her or do an assessment *after* the juveniles were removed from her home. In support of this argument, her brief cites to the testimony of Social Worker Campbell. Social Worker Campbell's only involvement in the case was on the evening of 14 June 2018, as Social Worker Hayden was the regularly assigned social worker for the case at that time. Finding of Fact 19 states: "Social Worker Campbell again attempted to interview Respondent-Mother and complete a Safety Assessment *once the juveniles had left the scene,* but Respondent-Mother refused." (Emphasis added.). The Findings 15 through 18 address in detail the events of 14 June 2018, when Social Worker Campbell went to investigate a report that Joe was at the home in violation of a safety agreement "that [Mother] would not allow [Joe] around the children." Mother does not challenge Findings 15 through 18, which address her admission that Joe had been at the home, her disbelief in Sara's allegations of sexual abuse, and her refusal to answer Social Worker Campbell's questions. Mother's only argument is that the words "once the juveniles left the scene" are not accurate. Mother is correct that Social Worker Campbell's testimony was that she attempted to talk to Mother *before* the children were removed, not *after,* although they were talking outside the home, in the driveway, and not in the home with the children present. Since Social Worker Campbell was not the regularly assigned social worker

- 14 -

for the case, the follow-up after 14 June was done by Social Worker Hayden several days later. Thus, Mother is correct that the words "once the juveniles left the scene" are not supported by clear and convincing evidence, but the rest of the finding is supported by clear and convincing evidence. Even if we ignore these words of Finding 14, this minor omission has no effect on the details of the events of 14 June 2018 or on the detailed findings regarding DSS's follow-up after that day.

Mother also challenges the first sentence of Finding 31 as unsupported by the evidence:

> 31. [Sara] has remained in placement with Respondent-Father since June 14, 2018, and [Ed] has been placed with him since August 13, 2018.

She contends the evidence does not support the finding as to Ed's "placement" with Father in August. She notes that the Guardian ad Litem's report states that both children "have been in this placement [with Father] since mid-June." Social Worker Hayden also testified that both children were placed with Father as of "June [when] [Joe] was found in the residence[.]" Mother is correct that the reports and evidence show that both children had been *residing* with Father as of mid-June, but Ed had not been officially placed, by court order, until August. The Petition was filed on 13 August 2018 and on the same date, the trial court entered an Order for Nonsecure Custody on 13 August 2018 which placed both children with Father. Sara had been placed with Father in June under the existing safety plan, but Ed was not.

This Order found that DSS had made efforts to "prevent or eliminate the need" for the placement by arranging a child medical evaluation for Sara and counseling for Sara and Mother and by "encouraging Respondent-Father to seek a modification of the existing custody order." The Petition alleges Father had filed a motion to modify the Chapter 50 custody order on 30 July 2018, but "his motion for *ex parte* relief was denied when the Court realized the Department of Social Services was involved." Thus, DSS filed the Petition and obtained the Nonsecure Custody order. Therefore, Finding 31 is supported by the evidence, since Ed was not officially "placed" with Father until August 2018, although Ed had been *residing* with Father since June.

Mother also challenges Finding of Fact 36 which states:

> 36. Respondent-Mother has refused to sign releases for the Department or the Guardian Ad Litem such that no information is available as to her compliance or lack thereof with recommended services nor did Respondent-Mother present any direct evidence as to her compliance.

The Court Report by DSS was presented as evidence at the adjudication and disposition hearing. The report states "[Mother] has refused to sign releases for the Department or GAL to follow up with collateral contacts regarding any of her services." The Guardian ad Litem's court report stated that Mother "was asked to complete a CCA" and "[t]he release she signed for the Department was limited and did not allow access to a copy of the CCA." Mother had reported that she was "diagnosed with anxiety and depression." The Guardian ad Litem asked Mother "to

sign a release but the Guardian has been unable to reach her Therapist as of the writing of this report [dated 6 December 2018]." Mother did not present any evidence regarding her compliance with the recommended services at the hearing. Finding 36 is supported by clear and convincing evidence.

Therefore, all of the challenged findings of fact, except for the words in Finding 19, discussed above, are supported by clear and convincing evidence.

IV.    Probability of Repetition of Neglect

Mother contends that the trial court erred by concluding both children were neglected because the trial court failed to make findings of a probability of a repetition of neglect at the time of the adjudication hearing.[6]

Mother argues the trial court failed to make any findings or conclusions regarding a "probability of a repetition of the past neglect" or "whether any past neglect had been adequately remedied, and whether Mother was able to adequately care for her children and provide for their physical and economic needs" as of the time of the hearing. She contends that Sara's abuse occurred prior to March 2018, that she promptly reported the abuse and sought evaluation and treatment for Sara, and that she did not allow Joe in Sara's "presence" after DSS requested that he not be in the presence of the children. She contends she continued to ensure Sara was not in

---

[6] We consider this argument as to the adjudication of Sara only because we must reverse the adjudication of neglect regarding Ed because there were no findings of any neglect or substantial risk of future abuse or neglect to Ed based upon the sexual abuse of Sara. *See infra* Part V.

his presence—even while acknowledging Joe came into the home—and she eventually accepted Sara's report of sexual abuse and supported her. By the time of the hearing, in November 2018, she contends she had "accepted the allegations and ended her relationship with [Joe]." She also notes that the children were removed from her home in June "without a court order and despite an existing civil Order granting Mother custody." She also claims it is "unclear what services were being provided to Mother other than counseling with Ms. Depuy and some visitation." She contends the trial court failed to "resolve conflicts in the key evidence" regarding her living circumstances at the time of the adjudication hearing, her counseling, Ed's bond with her, Joe's denials to Mother regarding Sara's abuse, her "innocent explanation for the hallway dresser with Joe's old clothes," and many other facts. She contends she immediately sought help for Sara, supported her disclosure of abuse even if she had difficulty accepting it at first, and denied Joe was even "in the presence of" the children after March 2018, even though she admits she testified that Joe "occasionally broke in" to the home and she "found him in the home without her consent or invitation."

Mother's arguments regarding the facts address mainly the trial court's determinations regarding credibility and weight of the evidence, which we cannot review on appeal. *In re C.J.H.*, 240 N.C. App. 489, 493, 772 S.E.2d 82, 86 (2015) ("It is the duty of the trial judge to consider and weigh all of the competent evidence, and

to determine the credibility of the witnesses and the weight to be given their testimony." (quoting *In re S.C.R.*, 198 N.C. App. 525, 531-32, 679 S.E.2d 905, 909 (2009)). As noted in the unchallenged findings of fact quoted above, Mother continued to express disbelief of Sara's revelation of sexual abuse up until the hearing, when she stipulated "for purposes of this action," it had occurred. She discredited Sara during their counseling sessions, and her visits with Sara were also difficult due to her disbelief. In fact, Mother's continued disbelief was part of Sara's "trauma narrative." Mother continued to express her love for Joe and her desire to marry him for months. Mother argues she had "innocent explanations" for the presence of Joe's clothing and drug paraphernalia in her home, even as late as August,[7] and she continued to come up with different explanations each time she was asked. She also testified that she was sometimes unaware that Joe was in the house because "[w]hen you're upstairs, you can't hear anything downstairs" and that she could not keep Joe out of the house. At trial, after admitting Joe had been in the house several times after March 2018, Mother was asked if she was "concerned that the man who had

---

[7] More than two months after the children were removed from the home, a Social Worker found that Mother's master bedroom was still "full of [Joe]'s clothes as well as drug paraphernalia and other items belonging to [Joe]." Her explanations for the continued presence of Joe's clothing and belongings in the home were nonsensical. She first claimed clothes are "expensive" so she did not get rid of them because Joe may need them. But if he was not living in the home, he would not have access to the clothing and thus would presumably need to buy new clothing to wear anyway, since his old clothing was still in the home and inaccessible to him. Mother then claimed the dresser in which the clothing was stored was "heavy" and she could not move it. She did not explain why she could not simply remove the clothing from the heavy dresser and arrange for Joe to get it without coming to the home. In fact, Mother was still residing in the home owned by Joe's brother until just prior to the hearing.

sexually assaulted your daughter had access to your home without you knowing about it?" She replied that "[Joe] would have had access no matter what," even if she changed the locks because he would break in. But she did not call the police when he broke in because she did not need "more chaos and drama." She argues that she had moved away from the home owned by Joe's brother. But she testified at the first day of the hearing, on 28 November 2018, that she was in the process of finding a new place to live and was staying with a friend and presented no evidence that she ever actually found a new residence.

Based on the findings of fact, the trial court did resolve the relevant issues presented by the evidence. The trial court did not find Mother's claims of ending her relationship with Joe or her support for Sara's report of sexual abuse to be credible. There was no evidence upon which the trial court would have been able to find that Mother had obtained a new residence where Joe would not have access "no matter what," as the only evidence was Mother had just begun looking for a new place to live. But despite these findings of fact, Mother is correct that the trial court did not make a specific finding regarding the "probability of repetition" of neglect.

The Guardian ad Litem concedes the trial court did not address the probability of repetition of neglect specifically but argues there was no need for the trial court to make this finding. Normally, the issue of the probability of *repetition* of neglect arises in termination of parental rights cases or in cases where there has been a prior

adjudication by the court. It is well-established when the court has made a prior adjudication of neglect and the child has not lived with the parent for a period of time, the prior neglect cannot be the sole ground for termination of parental rights unless the court has determined there is a probability of repetition of the neglect if the child were returned to the parent. *See In re Brim*, 139 N.C. App. 733, 742, 535 S.E.2d 367, 372 (2000) ("[A] prior adjudication of neglect may be admitted and considered by the trial court in ruling upon a later petition to terminate parental rights on the ground of neglect." However, such prior adjudication, standing alone, will not suffice where the natural parents have not had custody for a significant period prior to the termination hearing. Therefore, the court must take into consideration "any evidence of changed conditions in light of the evidence of prior neglect and *the probability of a repetition of neglect*. The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*." (alteration in original) (citations omitted) (quoting *In Re Ballard*, 311 N.C. 708, 713-15, 319 S.E.2d 227, 231-32 (1984))). But the definition of neglect is the same, whether for purposes of an adjudication or for termination of parental rights. *See* N.C. Gen. Stat. § 7B-101(15).

Here, the trial court concluded that Sara was neglected because she does not "receive proper care, supervision, or discipline" and she "lived in an environment injurious to [her] welfare." The trial court's conclusion of neglect by Mother was not

based simply on the findings of sexual abuse by Joe; Mother was not aware the abuse was happening until March 2018, and she did act immediately to stop the sexual abuse. The trial court's conclusion of neglect based upon Sara's emotional injury from the failure to receive proper care and supervision and an injurious environment were based upon the findings regarding what had happened *after* March 2018: Mother's failure to support Sara, her prioritizing her relationship with Joe before Sara's welfare, her efforts to discredit Sara in therapy sessions, and her apparent inability to keep Joe out of her home. Mother continued to live in the home owned by Joe's brother until the time of the adjudication hearing, despite her claim that Joe kept breaking into the home and showing up in the home without her even hearing him. Mother simply had not demonstrated her willingness or ability to ensure that Sara was protected from Joe, even after repeated warnings from DSS. The trial court's findings of fact and conclusion of neglect properly consider Mother's circumstances and ability to care for Sara at the time of the adjudication and were based upon the "physical, mental or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re R.L.G.*, 260 N.C. App. 70, 75, 816 S.E.2d 914, 918 (2018) (quoting *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993)).

V. Adjudication of Neglect as to Ed

Mother contends that the trial court's findings of fact were not sufficient to support its conclusion of law adjudicating Ed as a neglected juvenile. We agree.

A neglected juvenile is one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2019). In determining whether a juvenile is neglected, "it is relevant that juvenile lives in a home . . . where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." *Id.* The decision of the trial court regarding whether the other children in the home are neglected, "must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999).

If the trial court relies on instances of past abuse or neglect of other children in adjudicating a child neglected, the court is required to find "the presence of other factors to suggest that the neglect or abuse will be repeated." *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489 (2014). "[W]hile this language regarding neglect of other children 'does not mandate' a conclusion of neglect, the trial judge has 'discretion in determining the weight to be given such evidence.'" *In re P.M.*, 169 N.C.

App. 423, 427, 610 S.E.2d 403, 406 (2005) (quoting *In re Nicholson*, 114 N.C. App. 423, 427, 610 S.E.2d 852, 854 (1994)). "Section 7B-101(15) affords 'the trial court some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside.'" *In re C.M.*, 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (quoting *In re McLean*, 135 N.C. App. 387, 395, 521 S.E.2d 121, 126 (1999)).

Here, the trial court's findings focused almost exclusively on Sara, as a result of the sexual abuse by Joe, and the trial court relied on instances of Sara's past abuse to adjudicate Ed neglected. Only two findings address Ed specifically, Findings of Fact 29 and 34. The findings do not address any impact of Sara's abuse on Ed but instead find only that he "is a healthy, happy five-year-old" with "no ongoing health concerns." The only findings of abuse of Sara were sexual abuse by Joe. There are no findings that this abuse had any effect on Ed, or that there was any reason to believe Joe may abuse Ed in the future. In this regard, this case is quite similar to *In re J.C.B.*, where the trial court found the respondent-father had sexually abused one of the juveniles in the home, although there were no allegations of abuse of the other children:

> Even if we assume *arguendo* that respondent-father abused R.R.N., a juvenile, in the home where J.C.B., C.R.R., H.F.R., and respondent-father lived, this fact alone does not support a conclusion that J.C.B., C.R.R., and H.F.R. were neglected. The trial court made virtually no findings of fact regarding J.C.B., C.R.R., or H.F.R., and

wholly failed to make any finding of fact that J.C.B., C.R.R., and H.F.R. were either abused themselves or were aware of respondent-father's inappropriate relationship with R.R.N. Additionally, the trial court failed to make any findings of fact regarding other factors that would support a conclusion that the abuse would be repeated. As a result, the findings of fact do not support a conclusion that respondent-father's conduct created a "substantial risk" that abuse or neglect of J.C.B., C.R.R., and H.F.R. might occur.

233 N.C. App. at 644–45, 757 S.E.2d at 489–90 (citation omitted).

Here, as in *In re J.C.B.*, the trial court did not make any finding even of any risk of physical, mental or emotional impairment to Ed or the presence of other factors supporting a conclusion that he was neglected. The only specific finding regarding Ed is that he is happy, healthy, and has no "health concerns." Thus, the trial court's findings of fact do not support its conclusion of law regarding adjudication of neglect regarding Ed.

Based upon our review of the record, there is evidence which could support additional findings addressing the potential risk to Ed based upon Sara's neglect, such as Respondent-Mother's continued refusal to believe Sara was abused and repeated misrepresentations regarding Joe's continuing presence in the home in violation of the safety plan. But this Court cannot make the findings of fact, as only the trial court has the discretion to make findings. *See In re H.D.H.*, ___ N.C. App. ___, ___, 839 S.E.2d 65, 67 (2020).

On remand, the trial court shall make findings addressing the relevance of the

sexual abuse of Sara and the effect of Mother's neglect upon Ed, if the trial court deems the evidence sufficient to support such findings. In its discretion, the trial court may hold an additional hearing and consider additional evidence regarding the allegation of neglect as to Ed.

VI.     Transfer of Jurisdiction under North Carolina General Statute § 7B-911

Mother contends that the trial court's order "fails to meet the requirements of N.C. Gen. Stat. §7B-201 and §7B-911." She contends the order fails to make the required findings and conclusions to terminate the jurisdiction of the juvenile court and to transfer jurisdiction to civil district court. We review an order's compliance with statutory requirements *de novo*. *In re. J.K.*, 253 N.C. App. 57, 63, 799 S.E.2d 439, 443 (2017).

We first note that the trial court intended and directed that two orders be prepared and entered based upon the hearing. The trial court instructed counsel as follows at the close of the hearing:

> So, Ms. Cairo, I'm going to ask you to draw that order. I'm going to convert this to Chapter 50. And so, Ms. Jennings, I'll ask you to draw the custody order out of this pursuant to 7B 911.
> MS. JENNINGS: Okay.
> THE COURT: With appropriate findings. Since custody's being granted to a parent, we don't have to have the case open for any period of time. And -- and by operational law, this order will actually resolve the pending motion in the open Chapter 50 case.

>     And then if there are issues about visitation or
> further issues about custody, then it can go back to that
> court and it can be between these two young people.
>     MS. JENNINGS: Okay.  Thank you, your Honor.
>     THE COURT: So I'll ask each of you to share your
> orders with Ms. Harjo and Ms. Everett for their input.
>     Reviews are waived.
>     Guardian's released.
>     Counselor released.
>     . . .
>     MS. CAIRO: Your Honor, I would also ask for a
> provision that -- that [Joe] be prohibited from having
> contact with either child.
>     THE COURT: Yes.  That should be in both orders.
> Thank you for pointing that out, Ms. Cairo.  That should be
> in both the 7B order and the Chapter 50 order.

In addition, the order on appeal included a decree that a separate order be prepared and entered:

> Attorney Jennings shall prepare an Order reflective of the
> findings, conclusions and decretal set forth herein, and the
> same shall be filed in the existing Chapter 50 custody
> action between Respondent-Parents, to wit, New Hanover
> County Case Number 16 CVD 1965. All further hearing as
> may be necessary shall be conducted under that case file
> and shall occur in regular civil district court.

The briefs concede only one order, the one on appeal, was entered.  Thus, it is not surprising that the order on appeal fails to include all of the findings and conclusions as required by North Carolina General Statute § 7B-911, as the trial court directed that another order be entered to address these matters.

Here, there was a pre-existing Chapter 50 custody proceeding in which Mother and Father were parties and there was a custody order in effect when the petition

was filed. Because "the juvenile [was] already the subject of a custody order entered pursuant to Chapter 50," the trial court was required to enter an order which "makes findings and conclusions that support modification of that order pursuant to G.S. 50-13.7." N.C. Gen. Stat. § 7B-911(c)(1) (2019). The trial court's order did not include any findings or conclusions regarding a substantial change in circumstances affecting the best interests of the minor child, as required by North Carolina General Statute § 50-13.7. *Hibshman v. Hibshman*, 212 N.C. App. 113, 710 S.E.2d 438 (2011) (finding remand for further proceedings to be required where trial court did not make a finding showing a substantial change in circumstances before modifying custody).

The trial court also failed to find, as required by N.C. Gen. Stat. § 7B-911(c)(2)(a), that "[t]here is not a need for continued State intervention on behalf of the juvenile through a juvenile court proceeding." We therefore remand for entry of an order terminating juvenile court jurisdiction and transferring to civil district court, as directed by the trial court, including the appropriate findings of fact and conclusions of law.

VII. Visitation Order

Mother also contends that the trial court erred in its visitation order by allowing Sara discretion regarding visitation and cites to North Carolina General Statute §7B-905.1(a), (c) in support of her argument. However, the Guardian ad Litem states "[b]ecause the court placed custody with the father (not DSS) and

terminated the neglect case, N.C. Gen. Stat. § 7B-905.1 does not apply in regards to visitation." The Guardian Ad Litem is technically correct, in the sense that the trial court *intended* to end DSS's involvement in the case, to terminate jurisdiction of the juvenile court, and to enter a custody order under NCGS 7B-911. But as discussed above, the custody order required by NCGS 7B-911 and directed by the trial court was not entered, and we have remanded for entry of this Order. Because the trial court will necessarily address the details of visitation in the order on remand, we will not further address Mother's argument regarding Sara's visitation. In addition, as the trial court will need to hold a hearing on remand, the parties will have the opportunity to present additional evidence regarding visitation arrangements which will be in Sara's best interest upon remand.

## VIII. Conclusion

Because there were not sufficient findings of fact to support the trial court's conclusion of neglect as to Ed, we reverse the adjudication as to Ed and remand for further findings. The trial court's findings of fact as to Sara support its conclusion of law regarding her adjudication as neglected. However, the trial court failed to comply with the requirements of North Carolina General Statute § 7B-911 in terminating jurisdiction of the juvenile court and transferring the case as a Chapter 50 matter because the trial court failed to make findings of fact and conclusions of law regarding modification of the existing Chapter 50 custody order and failed to make a finding

stating there was no need for continued intervention by the juvenile court. In addition, the trial court failed to enter the Chapter 50 order as directed in its rendition and mandated by the Adjudication and Disposition order on appeal, so we must remand for entry of the Chapter 50 order in accord with North Carolina General Statute § 7B-911. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

On remand, the trial court shall hold a hearing and receive additional evidence as it deems appropriate to address the issues noted in this opinion and to enter a new order addressing the allegations of neglect as to Ed, an order addressing the termination of juvenile jurisdiction and transfer to the Chapter 50 custody action, and appropriate visitation provisions for Sara in accord with the trial court's findings on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judges INMAN and YOUNG concur.